**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| THEODORE E. BOND, CLAUDE FEDER, | : | |
| GRAHAM A. HUGHES, JATINDAR | : | Consolidated Case No. 08-3481(DRD) |
| KATARIYA, DOUG R. KEILL, | : | Original Case No. 08-5371(DRD) |
| ROBERT J. KENVILLE, BEVERLY | : | |
| KRUGER, FOSTER KNEELAND, | : | |
| GARY KYTTLE, CAROLE MIZZONI, | : | **O P I N I O N** |
| As Executrix for the Estate of Anthony | : | |
| Mizzoni, ROBERT E. MURPHY, | : | |
| THOMAS D. O'LEARY, | : | |
| ROBERT A. PLANT, GORDON B. | : | |
| REULAND, ARTHUR E. SIMMONS, | : | |
| CHRISTOPHER SLATER, | : | |
| and JOHN WAGGOTT, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| INGERSOLL-RAND COMPANY, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

Greenberg Dauber Esptesin & Tucker
One Gateway Center, Suite 600
Newark, New Jersey 07102
By:    Linda G. Harvey, Esq.

Brown & Tarantino, LLC
1500 Rand Building
14 Lafayette Square
Buffalo, New York 14203
By:    Kevin P. Wicka, Esq.
          Attorneys for Plaintiffs.

McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
By:    Anthony Bartell, Esq.

Attorneys for Defendant
Ingersoll-Rand Company

**Debevoise, Senior District Judge**

Plaintiffs in the this action (the "Bond Plaintiffs") allege that Defendant, Ingersoll-Rand

Company ("Ingersoll-Rand"), has breached a Sales Incentive Plan (the "SIP") which provided for

the issuance of Sales Value Units ("SVUs") to certain Ingersoll-Rand employees, including

Plaintiffs, redeemable in cash upon the sale of Ingersoll-Rand's affiliate, Dresser-Rand Company

("Dresser-Rand").  Dresser-Rand was sold on October 31, 2004.  Asserting that the Bond

Plaintiffs were not qualified "retirees" of Dresser-Rand and that, in any event, the SIP had

terminated, Ingersoll-Rand did not redeem the SVUs.  Plaintiffs sue to recover their value.

This action has been consolidated with two other actions: Walter Nye, et al. v. Ingersoll-

Rand Company, Civ. No. 08-3481, and James Calvin Brown, et al. v. Ingersoll-Rand Company,

Civ. No. 08-4260.  In Nye, 63 individuals who worked for Dresser-Rand until its sale filed suit.

In Brown, 50 individuals who worked for Dresser-Rand until its sale filed suit.  In the instant

Bond case, the 17 plaintiffs who worked for Dresser-Rand at the time the SIP was promulgated

had left the company prior to its sale but assert that nevertheless as retirees, they are entitled to

payment.[1]

The Bond Plaintiffs move for summary judgment holding that the SIP had not expired, as

---

[1]  The Nye, Brown and Bond actions arise out of facts substantially similar to those in two
previous cases that were consolidated and heard by this court: Ingersoll-Rand Company v.
Barnett, et al., and Antoun, et al. v. Ingersoll-Rand, Consol. Civ. No. 05-1636(DRD).  In
opinions in those cases the Court granted summary judgment to the plaintiffs.  As part of
settlements between the parties the opinions were withdrawn, and consequently they do not have
collateral estoppel effect in the instant case.  See 2006 U.S. Dist. LEXIS 78836, 2007 U.S. Dist.
LEXIS 12248.

contended by Ingersoll-Rand, and that the Bond Plaintiffs were retirees of Dresser-Rand and thus entitled to payment under the SIP.[2]  Ingersoll-Rand moved for summary judgment against all but three of the Bond Plaintiffs on the ground that they were terminated or were redundant and did not retire.

Ingersoll-Rand urges that the SIP expiration issue cannot be decided until completion of discovery without denying it due process of law.  However, the parties continue to seek extension of the discovery deadline, thus delaying disposition of all phases of the pending motions.  In view of certain practical considerations, the retirement and related issues, for which discovery is complete, will be decided at this time, leaving the SIP expiration issue for disposition at a future time.

The Bond Plaintiffs' motion for summary judgment will be granted to the extent that they seek a holding that their termination of employment with Dresser-Rand was a retirement within the meaning of the SIP and that they have not released any claims they might have under the SIP. A ruling on the Bond Plaintiffs' motion for summary judgment that the SIP has not terminated will be deferred.  Ingersoll-Rand's motion for summary judgment will be denied.

## I.  Background

Before February, 2000, Dresser-Rand was a joint venture owned forty-nine percent (49%) by Ingersoll-Rand and fifty-one percent (51%) by Dresser Inc.  In August, 1999, Ingersoll-Rand announced that it intended to sell its 49% interest to Dresser Inc.  Consistent with its rights under

---

[2]  Plaintiffs also moved for dismissal of Ingersoll-Rand's Counterclaim for tortious interference.  Ingersoll-Rand voluntarily dismissed the counterclaim with prejudice.

the joint venture agreement, Dresser Inc., elected not to purchase Ingersoll-Rand's interest, but, instead, to sell its 51% interest to Ingersoll-Rand. In February 2000, Ingersoll-Rand purchased Dresser Inc.'s 51% interest for approximately $543 million, at which time Dresser-Rand became a wholly-owned subsidiary of Ingersoll-Rand.

Thereafter, Ingersoll-Rand desired to divest itself of its interest in Dresser-Rand. To further this purpose and to achieve a desirable sale price for Dresser-Rand, Ingersoll-Rand adopted the SIP. It sent a copy of the plan and a cover letter to the key employees who were selected to participate in the program. Each of the seventeen plaintiffs received a notice, dated January 23, 2001, and marked "confidential," from B.D. Jellison announcing the "Dresser-Rand Sale Incentive Program." By way of example, the letter to Mr. Bond read:

> Congratulations on helping build the second half of 2000 into a strong foundation for the future of Dresser-Rand. The continued turnaround of the business and the execution of focused initiatives in developing new opportunities will make the business more attractive to a buyer. This in turn means a brighter and more secure future for our associates.
>
> We have developed an incentive plan for you, which is designed to reward your contribution towards improving Dresser-Rand's earnings now and in years to come. The plan rewards you for your efforts in achieving the best sales price for the Dresser-Rand Company.
>
> I am pleased to present you 3,000 Dresser-Rand Sale Value Units (SVU). These Sale Value Units will be converted into cash and a lump sum paid to you within 90 days of the date of sale of Dresser-Rand Company. The value of an SVU is directly related to the sale price of Dresser-Rand Company. The higher the sale price the higher the value of your SVU. A copy of the plan summary is enclosed.

Key provisions of the two-page SIP read as follows:

**INGERSOLL-RAND COMPANY**
**DRESSER-RAND SALE INCENTIVE PLAN**

4

PURPOSE

The Plan is structured to reward key employees for their contributions toward maximizing EBITDA (Earnings Before Interest Tax, Depreciation and Amortization) and consequently, a desirable sale price for Dresser-Rand Company. This will be achieved by granting Sale Value Units (SVUs) to key employees. The majority of SVUs will be granted to current employees before the end of December 2000. This plan is in lieu of any grant from a Stock Appreciation Right (SAR) Plan and/or Stock Option program for the years 2001, 2002 and 2003. (This program does not affect the SAR/Stock Option replacement program for grants 1998, 1999 and 2000).

EFFECTIVE DATE

The Plan is effective September 1, 2000 and will remain in effect until Dresser-Rand Company is sold.

PARTICIPATION

Eligibility for participation under this plan and actual SVU grants is restricted to those designated by Ingersoll-Rand Company (IR) Management.

INCENTIVE OPPORTUNITY

Eligibility participants will be granted a number of Dresser-Rand Sale Value units (SVUs). The value of one Sale Value Unit is directly related to the sale price of Dresser-Rand Company.

A grant will be made in January 2001 for the years 2001, 2002 and 2003.

PAYMENTS

Any award under this plan will be paid no later than 90 days following the closing date of the sale of Dresser-Rand Company.

TERMINATION

An employee who voluntarily terminates or is involuntarily terminated by the Company for any reason before the closing date of the sale, with the sole exceptions of death, disability, or retirement

5

shall not receive or be entitled to any award from this plan. For those employees who leave the Company for the reason of death, disability or retirement will receive a pro-rated award based on the time they were actively employed during the period from the effective date of this plan to December 31, 2002. Any payment due will be made within 90 days from December 31, 2002.

GENERAL PROVISIONS

The Intersoll-Rand Compensation and Nominating Committee will be the final arbiter regarding interpretation of this plan.

In the Termination provision of the SIP, an employee's "retirement" is the determinant of the employee's eligibility for SVU payments:

An employee who voluntarily terminates or is involuntarily terminated by the Company for any reason before the closing date of the sale, with the sole exceptions of death, disability, or retirement shall not receive or be entitled to any award from this plan. For those employees who leave the Company for the reasons of death, disability or retirement will receive a pro-rated award based on the time they were actively employed during the period from the effective date of this plan to December 31, 2002. . .

It is the Bond Plaintiffs' contention that they are retirees of Dresser-Rand. and/or have been treated as retirees of Dresser-Rand and consequently are entitled to their pro-rated payment under the SIP. It is Ingersoll-Rand's contention that 14 of the 17 Bond Plaintiffs left the company's employ for the reason of a reduction in force and not retirement and therefore are not entitled to any award from the plan.

Before examining the circumstances of each Bond Plaintiff's termination, certain facts should be noted. First, aggressive efforts to sell Dresser-Rand ended at the end of 2002, with the possibility of future reinstatement. A program commenced to integrate Dresser-Rand into Ingersoll-Rand's general operations.

6

Second, Ingersoll-Rand and Dresser-Rand had in place a number of employee benefit plans that were independent of the SIP.  Dresser-Rand had pension plans providing for payments to employees after termination of employment.  These plans had eligibility requirements based on years of service.  Dresser-Rand had a retiree health program limited to age and years of service, and it had an insurance program for retirees.

Third, after January 2001, when the SIP was adopted, Dresser-Rand increased the sales of its products and, according to Ingersoll-Rand's 2002 and 2003 Annual Reports, Dresser-Rand's revenues increased 6% in 2001 ($881 million), 16% in 2002 ($1.024 billion), and 30% in 2003 ($1,334 billion).  Between 2001 and 2003, Dresser-Rand's operating income increased from $21.4 million to $43.4 million.  Ingersoll-Rand sold Dresser-Rand on October 31, 2004.  In connection with its efforts to sell Dresser-Rand in 2004, Ingersoll-Rand introduced a new sale reward retention plan (the "2004 Plan") that applied only to active employees at the time of Dresser-Rand's sale.

## II.  Summary Judgment Standard

### The Summary Judgment Standard

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Rule 56(c) imposes a burden on the moving party simply to point out to the district court that there is an absence of evidence to support the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has met this burden, the burden then shifts to the non-moving party.  The non-moving party "must do more than simply show that there is some metaphysical

doubt as to the material facts." <u>Matsushita Elec. Indus. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Moreover, the non-moving party may not simply "replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)). Rather, he must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The facts asserted by the party opposing the motion, however, if supported by affidavits or other evidentiary material, must be regarded as true. <u>Janek v. Celebrezze</u>, 336 F. 2d 828 (3d Cir. 1964).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. <u>Id.</u> at 247. In determining whether there exists a material issue of disputed fact, however, the facts and the inferences to be drawn from the facts are to be viewed in the light most favorable to the non-moving party. <u>Pollock v. Am. Te. & Tel. Long Lines</u>, 794 F.2d 860, 864 (3d Cir. 1986).

### III. <u>The Challenged Bond Plaintiffs</u>

The SIP provides that "[f]or those employees who leave the Company for the reason of . . . retirement will receive a prorated award . . ." Ingersoll-Rand contends that all but three[3] of the <u>Bond</u> Plaintiffs left the Company because they were terminated or were redundant. The circumstances of the termination of each of the contested <u>Bond</u> Plaintiffs will be examined to

---

[3]  The three against whom Ingersoll-Rand does not move at this time are Claude Feder, Jatindar Katariya and Robert A. Plant.

determine if they "retired" within the meaning of the SIP.

A. Theodore E. Bond: In 1970 Bond started a nearly 22-year career with Ingersoll-Rand and Dresser-Rand. He continued to work for Ingersoll-Rand (or one of its predecessors) until 1979. He worked again for Dresser-Rand from 1990 until his departure on August 31, 2003.

Unexpectedly, in late August 2003 Robert Haffner of Human Resources and Brook Tolman of General Management came to Bond's office and told him it was a lay-off. He was given a termination agreement to review with his attorney.

The agreement, dated August 29, 2003, provided that his active employment would continue until August 31, 2003, that Bond would receive severance of $26,324 and that "[t]he Company will make available Career Transition Services consistent with your level and needs." In addition it provided "Extended Health Benefits. The Company will supplement your 'COBRA' election for medical and dental coverage through October, 2003 at the same access rate paid by active salaried employees."

A paragraph 5 covered "Other Benefits:"

> All other regular and executive Company benefits will be paid according to the specific plan or practice. $26,324 is classified as severance payments and this will not be used in the calculation of any other company-sponsored benefit.

Paragraphs 7 and 8 constituted a release of claims against Dresser-Rand:

> You hereby irrevocably and unconditionally release and forever discharge Dresser-Rand, its parents, their affiliates and subsidiaries, each and all of their officers, agents, directors, supervisors, employees, representatives, and their successors and assigns all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claims, and liabilities of any kind suspected or unsuspected (hereinafter referred to as "claim or "claims") which you at any time heretofore had or claimed to have or

9

which you may have or claim to have regarding events that have occurred as of the date of this Agreement, including without limitation, any and all claims related or in any manner incidental to your employment with the company or the termination therefrom. It is expressly understood by you that among the various rights and claims being waived in this release are those arising under the Age Discrimination in Employment Act (29 U.S.C. § 621, et. seq.).

The parties understand the word "claims" to include all actions, claims, and grievances, whether actual or potential, known or unknown, and specifically but not exclusively all claims arising out of your employment with the Company and termination. All such claims (including related attorney's fees and costs) are forever barred by this Agreement and without regard to whether those claims are based on any alleged breach of duty arising in contract or tort; any alleged unlawful act, including, without limitation, age discrimination; any other claim or cause of action; and regardless of the forum in which it might be brought.

The releases in the Bond Agreement and in the other Plaintiffs' Agreements are interesting in a number of respects. Many employees had been inquiring about the continuing validity of their SVUs. In view of the dramatic increase in the business fortunes of Dresser-Rand their value had increase substantially and, if valid, the SVUs represented a substantial potential liability for Ingersoll-Rand if Dresser-Rand were sold. As of the dates of the Termination Agreements Ingersoll-Rand had not committed itself one way or the other with respect to the continuing validity of the SVUs, but it must have been aware of the potential liability it faced.

The Termination Agreements continued this non-committed status. In the release provisions the retiree did not explicitly release Dresser-Rand from this liability, but for Dresser-Rand to have asked for such a release, which Dresser-Rand could have done, would undoubtedly have deterred Bond Plaintiffs from seeking or accepting early retirement. Instead, through the vehicle of the "Other Benefits" provision, Dresser-Rand permitted the employee to infer that the

SVUs survived: "All other regular and executive Company benefits will be paid according to the specific plan or practice."

After the termination of his employment Bond executed a Dresser-Rand Notification of Intent to Elect Retirement form on which he stated that he wanted his pension benefits to begin in April 2010.

B. <u>Graham A. Hughes</u>: Hughes started his career with Ingersoll-Rand and/or Dresser-Rand in 1965 and remained with them for nearly 38 years. In January, 2001 he received the Jellison memo in which he was awarded 4500 SVUs.

In December, 2003, Hughes approached Adam Nightingale, Dresser-Rand's Director of Human Resources, and informed him he was ready to retire. A day later Nightingale approached Hughes with an incentive package to retire. A company Termination of Service Form stated:

> The following employee is an involuntary RIF:
> Graham Hughes
> Effective 12/31/2004
> He is retiree eligible.

Hughes executed a typical Termination Agreement that provided that its effective date was December 31, 2003. Severance pay amounted to $95,000. The Agreement contained the following clauses: Career Transition Services, Extended Health Benefits, Other Benefits, and release of claims against Dresser-Rand.

Hughes by reason of age (61 years) and 38 years of service was eligible for and received a pension, and among the "Other Benefits" were medical coverage and life insurance. The Benefits Confirmation Statement listed the "<u>Retiree</u> + One" and in a September 2004 letter he was informed that "the current Dresser-Rand salaried <u>retiree</u> insurance program will transition to

11

Ingersoll-Rand." He was provided with a "2007 <u>Retiree</u> Worksheet" to complete.

     C. <u>Douglas R. Keill</u>: Keill began his 16 year career with Ingersoll-Rand/Dresser-Rand in 1986. In January, 2003 he received the Jellison memo and was awarded 3,000 SVUs. In December 2002 or January 2003 the Director of Human Relations in Europe inquired if he were interested in retiring, stating that he could retire at that time or wait until he was 65 in August, 2003. Company documents state his termination was due to redundancy. A Company document furnished to him stated:

EMPLOYEES WHO HAVE SELECTED
TO TAKE EARLY RETIREMENT

     Your early retirement pension will be payable from the first day of the next month following your termination of employment with the Company.

     The record includes a multitude of Company documents dealing with Keill's 'retirement." In what appears to be a desperate effort to push the redundancy theme, a November 29, 2004 memo from Lori M. Sives to Tony Edwards classified as "high" importance and "Confidential Sensitivity" read:

     Can you please confirm:

     1. that Douglas Keill did NOT retire? Redundancy. He received a severance payment. This payment was reduced due to his retirement date falling in the coming 12 months.

     A lengthy document was entitled "Notes to Accompany Quotation of Retirement Options." Even while stressing "redundancy," Dresser-Rand refers to Keill's retirement.

     D. <u>Robert Kenville</u>: Kenville's 40 year career with Ingersoll-Rand/Dresser-Rand began in 1963. he received the January 23, 2003 Jellison memo and was awarded 1800 SVUs.

12

In June 2003 Kenville sent an email to Tim Meadows of Human Resources stating that if an early retirement package were to be made available he would be interested.  He was invited to Human Resources for a discussion concerning retirement.  He was presented with the standard retirement that was modified to include the following introductory material (material used in several other agreements with employees who had initiated retirement conversations):

> This letter is in response to your request to volunteer for a reduction in force from Dresser-Rand.  While there is no formal Early Retirement Program the Company has determined that due to the current restructuring activities your position will be eliminated. Therefore by signing the Certification at the end of the letter you are confirming that you have volunteered for termination from the Company in return for receiving the compensation described below. The benefits contained herein exceed that which you would otherwise be entitled to receive.

This addition to the standard agreement is interesting.  It is not quite accurate when it says "while there is no formal Early Retirement Program."  There was always in place what could be considered an early retirement program.  There were available to employees pension programs, medical programs and insurance programs available as of right when certain age and time in service requirements were met.  Kenville and the other Bond Plaintiffs, by reason of their ages and years in service could have stepped into those programs, which were included in the agreements "Other Benefits" category.

The addition is also interesting as evidence of Dresser-Rand's efforts to develop their defense against a potential SVU claim by transforming Kenville's request for early retirement into "volunteer[ing] for termination from the Company."

In any event, Kenville signed the Agreement that was effective July 25, 2003 and provided for severance of $61,064.77, $1,000 in lieu of career transition services, extended

health benefits and Other Benefits (i.e., pension, life insurance).  The Agreement contained the standard release.

The Employee Change Form gave the reason for the termination as "Reduction-in-Force" but noted "Voluntary-reduction-in-Force."  Medical, dental and all other applicable benefits end on 07/25/2003.  Eligible for 'retiree' benefits.  Severance pay of $61,064.77 + 1,000 (special adjustment payment) to be paid upon receipt of signed agreement."

Kenville was also provided with Retiree Benefit Information that informed Kenville of the following:

Included in your retiree benefits packet are the following items:

- A Retiree Benefits Handbook Page 2-1 contains the eligibility requirements for participation in the Dresser-Rand Medical plan.  Page 5-1 contains the eligibility requirements for participation in the Dresser-Rand Retiree Life Insurance plans.

- Summaries of Material Modifications

- A Retiree Benefits Enrollment Form

- A Retiree Benefits Rate Sheet

- An Employee Assistance Program Brochure

The document described in detail the Retiree Benefits Handbook, the Retiree Benefits Enrollment Form, and the Retiree Benefits Rate Sheet.

E.  <u>Foster Kneeland</u>: Kneeland began his 29 year career with Ingersoll-Rand/Dresser-Rand in 1975.  He received the January 23, 2003 Jellison memo and was awarded 2400 SVUs.

Kneeland asserts that effective May 15, 2004 his employment with Dresser-Rand terminated and "began my retirement from Dresser-Rand.  Based on my age and length of time

with the company, I was immediately eligible for retirement benefits." On May 10, 2004, he was

presented with a May 10, 2004 Agreement which contained no reference to a reduction in force

in the body of the Agreement, and followed the pattern of the agreements with the other Bond

Plaintiffs. He received severance pay of $46,806, Career Transition Service, Extended Health

Benefits and Other Benefits. The Agreement contained the standard release clause, and attached

to it was Additional Severance Information:

> The following information is being provided to you so as to enable
> you to evaluate the severance program which is being offered in
> connection with the workforce reduction. You must decide whether
> or not to accept the terms of the accompanying letter agreement,
> which includes a general release of claims, within 45 days after
> receipt of this information. An employee who does not sign and
> return the letter agreement within 45-day period will not receive the
> enhanced benefits as explained in the agreement.

> The decisional unit consists of those similarly situated employees
> who were considered in the reduction in force that is affecting you.
> These include: Steam Project Development Manager employees. The
> Schedule shows the ages and job titles of the decisional unit
> employees who are and are not affected by this reduction in the work
> force.

The company's Employee Action Form included the explanation of reason for

termination "Reduction-in-Force-Involuntary." He received from the company the forms

necessary to implement health benefit and pension plans. The insurance instructions were

addressed to "Dear Retiree." The Termination Checklist dated May 14, 2004 approved by a

Human Resources representative noted that Kneeland had received the "Retirement Plan."

    F. <u>Beverly Kruger</u>: Kruger's employment with Ingesoll-Rand/Dresser-Rand began in

1960 and, with a temporary maternity leave from 1965 to 1969, continued until April, 2004,

representing almost 35 years of service. She received the January 23, 2001 Jellison memo along

with 1,200 SVUs.

In or about October of 2003 Kruger commenced discussing retirement possibilities with a co-worker who explained that he was eligible for a retirement incentive to retire early.  Kruger communicated with Director of Human Resources, Adam Nightingale, to ascertain if she were eligible for the same retirement program.  He informed her that she was not, but in March, 2004, Nightingale provided her with a March 26, 2004 version of the standard Agreement that commenced:

> This letter is in response to your request for early retirement from Dresser-Rand.  By signing the Certification at the end of this letter you are confirming that you have volunteered for termination from the Company, in return for receiving the compensation described below.  The benefits contained herein exceed that which you would otherwise be entitled to receive.

Kruger received severance pay in the amount of $53,534 and also Extended Health Benefits and Other Benefits as contained in the other Agreements.  She agreed to the standard release clause.  Attached to the Agreement was the Additional Severance Information paragraph which recited that the severance program 'is being offered in connection with the workforce reduction."

Even though the Agreement recited that it was in response to Kruger's request for early retirement, the Dresser-Rand Employee Change Form gave the reason for termination as "Involuntary RIF/Early Retirement."  This was obviously a part of Dresser-Rand's efforts to camouflage the retirement aspect of the various terminations and portray them as solely reductions in force.  With respect to Kruger a personnel officer noted it as a "Problem Description", stating "Susan B called to notify us of Ben Kruger's termination date of

16

04/02/2004.  I entered the termination in Oracle, as an Involuntary RIF w/no benefit extension date as she is taking retiree insurance."

      G.  <u>Gary Kyttle</u>: In 1973 Kyttle began a 30 year career with Ingersoll-Rand/Dresser-Rand.  He received the January 23, 2001 Jellison memo and was awarded 4500 SVUs.

      Kyttle elected early retirement, and as of April 15, 2003 was eligible for retirement benefits by reason of age (61) and years of service.  His April 4, 2003 Agreement paralleled the other <u>Bond</u> Plaintiff Agreements.  It recited that "[t]his is a special agreement incorporating benefits and programs tailored specifically to your situation."  His severance payment was $122,896.  He possessed vested stock options that were recognized, and he received Extended Health Benefits, Financial Planning Counseling and Other Benefits.  Kyttle was retained as a consultant until August 15, 2003.  His Agreement included the standard release form.

      The Employee Change Form recited "Terminate Reduction-in-Force Voluntary.  Effective 4/15/2003.  Pay Lump Sum Separation Payment of $122,896.  Eligible for Company Retirees Health Program".  Kyttle completed a Dresser-Rand Retiree Benefits Form and was instructed to "Complete this form and return to your HR Coordinator before your retirement."  The Dresser-Rand Human Resources Coordinator on April 16, 2003 wrote to Kyttle, stating, I received your retiree benefit election papers for your April 15, 2003 retirement date and have listed your elections in the table below.   I have also included a brochure about the Employee Assistance Program that is available to all retirees."  He was provided with a Retiree Worksheet.

      A Dresser-Rand Organizational Announcement stated:

> After nearly 30 years of service, Gary Kyttle has announced his retirement from Dresser-Rand . . .

> Please join me in wishing Gary and Donna a well-deserved, enjoyable
> retirement.

Other company documents provided benefits based on age at retirement.

H.  <u>Anthony Mizzoni</u>: In 1974 Mizzoni (who died in 2007) began his 29 year career with Ingersoll-Rand/Dresser-Rand.  He received the January 23, 2001 Jellison memo and was awarded 1800 SVUs.

In August 2003 Mizzoni's wife requested that he retire, and he compiled.  Dresser-Rand presented him with the standard Agreement which, as part of the strategy to camouflage the retirement aspect of the transaction, stated:

> This letter is in response to your request to volunteer for a reduction
> in force from Dresser-Rand.  While there is no formal Early
> Retirement Program, the Company has determined that due to current
> restructuring activities, your position will be eliminated.  Therefore,
> by signing the Certificate at the end of this letter you are confirming
> that you have volunteered for termination from the Company, in
> return for receiving the compensation described below.

Severance in the amount of $55,044.92 was provided for.  Mizzoni received Extended Health Benefits and Other Benefits and agreed to the standard release language.  The Employee Change Form stated: "08/08/2003 - Voluntary Reduction-in-Force.  Medical, Dental, and all other applicable benefits end on 08/08/2003.  Eligible for 'retiree' benefits.  Severance pay of $55,044.92 to be paid upon receipt of signed agreement."  In a September 28, 2007 letter of condolences to Mrs. Mizzoni the Dresser-Rand Benefits Coordinator stated that "Your husband chose the 50% joint and survivor option at the time of his retirement."

I.  <u>Robert Murphy</u>: In 1959 Murphy began a 45 year career with Ingersoll-Rand/Dresser-Rand.  He received the January 23, 2001 Jellison memo and was awarded 2400 SVUs.

In October 2003 Murphy discussed the possibility of accepting a retirement incentive package with Fred Conroy, Vice President of Navy/Government Sales.  He had further discussion in November, 2003.  In December, Tim Meadows, Manager of Human Resources presented the standard Agreement that contained the same introductory paragraph as the Kenville Agreement, reciting his "request to volunteer for early retirement" and that "your position will be eliminated."

Severance in the amount of $74,142 was provided for as were Extended Health Benefits and Other Benefits.  The Agreement contained the standard release language.  Although the Agreement referred to Murphy's request to volunteer for early retirement, the Employee Change Form reported "Involuntary RIF."  Murphy was requested to complete a Dresser-Rand Retiree Benefits Enrollment Form "before your retirement."  The Benefits Coordinator directed that Murphy return his Vested Pension Form "no earlier than 90 days before your retirement date." The options available to him were "based on a January 24, 2004 retirement date."

J.  Thomas O'Leary: O'Leary began his 35 year career with Ingersoll-Rand/Dresser-Rand in 1968.  He received the January 23, 2001 Jellison memo and was awarded 2400 SVUs.

On July 18, 2003 O'Leary emailed Fred Conroy, a Dresser-Rand Vice President, seeking confirmation that if he retired he would still be eligible for a pro-rated bonus under the retirement portion of the SIP.  On or about July 23, 2003 he received a verbal reply from Conroy indicating that he would receive any payout under the SIP once the company (Dresser-Rand) was sold.

Dresser-Rand presented O'Leary with the standard form of Agreement.  Its introductory paragraph was the same as that which was used in the Kenville and Murphy Agreements: "This letter is in response to your request to volunteer for a reduction in force from Dresser-Rand, etc."

19

O'Leary received severance pay in the amount of $62,623.38 together with Extended Health Benefits and Other Benefits. O'Leary's Agreement contained the standard release provisions. In the circumstances of this Agreement the combination of the Release provisions and the Other Benefits provision is particularly illuminating. The release was of claims "regarding events that have occurred as of the date of the Agreement." Dresser-Rand had not yet been sold; so O'Leary had no claim for SVU payments, and such a claim was not released. The Other Benefits provision stated that "[a]ll other regular and executive Company benefits will be paid according to the specific plan or practices." Thus O'Leary had no reason to believe that if Dresser-Rand were sold he would not receive his SVU payment. This situation prevailed with respect to the other Bond Plaintiffs, but before signing the Agreement O'Leary had made a specific inquiry about the status of the SIP and was assured that he would receive any payment under the SIP once Dresser-Rand was sold.

As for O'Leary's retirement status, the Employee Change Form gave as a reason for termination "Reduction-in-Force," but went on to explain "Medical, dental, and all other applicable benefits and on 08/08/2003. Eligible for 'retiree' benefits."

An August 13, 2003 letter from the Human Resources Coordinator informed O'Leary:

> I received your retiree benefit election papers for your August 8, 2003 retirement date and have listed your elections in the table below.
>
> …
>
> I have also included a brochure about the Employee Assistance Program that is available to all retirees.

O'Leary was asked to return a Dresser-Rand "2004 Retiree Benefits Enrollment and Information Form" by November 26, 2003. O'Leary completed and returned the Form.

20

K.  Gordon Reuland: In 1973 Reuland commenced his 30 year career with Ingersoll-Rand/Dresser-Rand.  He received the January 23, 2001 Jellison memo and was awarded 3600 SVUs.

Reuland accepted retirement effective August 31, 2003 at a time when he was immediately eligible for benefits by reason of age (62) and years in services (28).  He signed the standard Agreement that in his case provided for severance pay of $65,000, Career Transition Services, Extended Health Benefits, and Other Benefits.  The Agreement included the standard release form.  His Employee Change Form characterized his termination of employment as "Reduction-in-Force Involuntary."

L.  Arthur E. Simmons: Simmons started his 34 year career with Ingersoll-Rand/Dresser-Rand in 1969.  He received the January 23, 2001 Jellison memo and was awarded 4500 SVUs.

On August 29, 2003, Robert Haffner, Human Resources Manager of Dresser-Rand presented him with the standard form of letter Agreement "concerning your departure from the Company and the relationship between you and Dresser-Rand that will follow."  It provided for severance pay in the amount of $78,734, recognition of Simmons right to exercise his vested stock options, Career Transition Services, Extended Health Benefits and Other Benefits.  The Agreement contained the standard release provision.  Appended to the Agreement was the Additional Severance Information seen in some of the Other Agreements to the effect that the program was being offered in connection with the workforce reduction.

A Dresser-Rand September 29, 2003 memo "re: Salaried Retirement Arthur E. Simmons stated:

> Arthur Simmons was terminated 8/31/03, but his actual termination

21

date was extended to 10/15/03 to allow him to grow into retiree eligible status.  At that time he will be retirement eligible and meets the criteria to retire . . .
Attached are his retiree medical enrollment papers.

- D-R Retiree Benefits Election Form - Traditional POS for himself

- Life Insurance Beneficiary Card

The Dresser-Rand Human Resources Generalist September 4, 2003 letter to Simmons commenced, "Our records indicate that due to your recent termination from Dresser-Rand, you are eligible to pursue your retirement effective 11/01/03."  It conclude with the statement, "If you have further questions about any of the retirement benefits, please do not hesitate to let me know (585-596-3635)."  Other retirement related forms were sent to, and completed by, Simmons.

M.  <u>Christopher Slater</u>: In 1988 Slater commenced his 16 years employment with Ingersoll-Rand/Dresser-Rand.  He received the January 23, 2001 Jellison memo and was awarded 4,500 SVUs.  In January, 2004, John Snyder, Vice President of Human Resources for Dresser-Rand communicated with Slater to discuss accepting early retirement.  Snyder explained that the company was looking to restructure and Slater's Human Resources Director of Europe position would not be required.  As Slater stated, "I was offered retirement because my position was redundant (a British term for when a position is no longer available).

Slater was eligible for retirement, being 53 years old and having served the company for 16 years.  He did not execute the standard agreement, but the documents formalizing his departure evidence, as is the case of the other <u>Bond</u> Plaintiffs, that even though his departure was in the context of a redundancy, he and Dresser-Rand considered it a retirement.

A July 30, 2004 Dresser-Rand letter to Slater stated:

22

This is to confirm that your employment with the Company ceased on 30 July 2004, the grounds for termination being due to redundancy.

Enclosed you will find:

1. Final Salary Settlement Statement
2. Holiday Pay information
3. Pension Statement
4. Private Medical Scheme information
5. Reference

With respect to the pension, the relevant document read:

EMPLOYEES WHO HAVE SELECTED
TO TAKE EARLY RETIREMENT

Your early retirement pension will be payable from the first day of the next month following your termination of employment with the Company.

You will receive your first payment into your nominated bank account one month after leaving the Company.

The Dresser-Rand document relating to the Slater Pension Plan was entitled "NOTIFICATION OF RETIREMENT", specified "Retirement" as of 30/7/2004.  With respect to medical benefits it stated, "The Company has, if ill-health is involved, obtained the Trustee agreement to this retirement.  Please pay retirement benefits on behalf of the Trustee in accordance with the instructions given below."

Slater received a "Redundancy Entitlement" (probably comparable to the "Severance" of the other Bond Plaintiffs) of  £33,551.35.

N.  John Waggott: Waggott started his 28 career with Ingersoll-Rand/Dresser-Rand in 1975.  He received the January 23, 2001 Jellison memo and was awarded 2400 SVUs.

On or about September 11, 2003, Waggott communicated with Manager for Human

Resources, Robert Haffner, to discuss early retirement.  He proposed this action in order to make

it unnecessary to lay off a younger colleague.  He proposed to perform consulting services for

Dresser-Rand for eight months.  A week after this communication, Heffner presented Waggott

with the standard Agreement, dated September 18, 2003, adapted to Waggott's circumstances.

  The introductory paragraph like those of other employees who had initiated the request

for early retirement, stated:

> This letter is in response to your request to volunteer for early
> retirement from Dresser-Rand. While there is no formal Early
> Retirement Program, the Company has determined that due to the
> current restructuring activities, your position will be eliminated.
> Therefore, by signing the Certification at the end of this letter you are
> confirming that you have volunteered for termination from the
> Company, in return for receiving the compensation described below
> representing a special agreement incorporating benefits and programs
> tailored specifically to your situation.

  The effective date of the Agreement was September 30, 2003 and it provided for

severance of $52,700 and that Waggott serve as a consultant until May 31, 2004.  Otherwise it

contained the standard provisions of the other <u>Bond</u> Plaintiff Agreements, Extended Health

Benefits and Other Benefits as well as the release provisions.  There was appended the

ADDITIONAL SEVERANCE INFORMATION as to the severance program being offered in

connection with a workforce reduction.

  The Employee Change Form gave as a reason for termination "R.F. - Voluntary."  A

September 19, 2003 Dresser-Rand letter advised Waggott: ". . . it is very important that you

recognize that even if you elect to defer your pension until a later date, you may elect to continue

your medical coverage as a retiree.  Your retirement will be effective 10/01/03.  Enclosed is

information for electing retiree medical and retiree life insurance benefits.  Note that since your

retirement age is under 65, you can elect to continue your current medical. . . Please complete the

Retiree Benefits Enrollment Form and the Life Insurance Beneficiary Form and return them to

my attention within 30 days of your termination date.  Refer to the enclosed copy of Your

Benefits Handbook for detailed specifics of retiree benefits . . ."

Other Dresser-Rand - Waggott documents referred to and were dependent upon his retiree

status.

## IV.  <u>The Non-Retirement Defense</u>

A review of the evidence establishes that Ingersoll-Rand's contention that the <u>Bond</u>

Plaintiffs' terminations were not for reason of retirement is totally without merit.  What the

evidence does establish is that in the critical year of 2003, Ingersoll-Rand engaged in a concerted

effort to make it appear that its terminated employees left its employ solely because of a

reduction in force and to disguise the fact that simultaneously the employees retired from

Dresser-Rand and were treated as retirees.  Dresser-Rand's purposes for termination in each case

is not the critical issue.  The critical issue is the employee's motivation, which, as to each

Plaintiff, was retirement, and the manner in which Ingersoll-Rand handled the departing

employee, which, in each case, was as a retiree.  This fulfills the purpose of the SIP which was to

permit persons who stayed with Dresser-Rand until they obtained retirement status to share in the

profits to which they had contributed and to encourage them to stay to that time.

What moved Ingersoll-Rand/Dresser-Rand to engage in the strategy is obvious.  In 2003

there was in existence the SIP, which by its terms "will remain in effect until Dresser-Rand

Company is sold."  It is Ingersoll-Rand's position that the SIP terminated on December 31, 2002,

but it had not made that position generally known to its employees in 2003.  It undoubtedly

planned to take that position at the proper time but was well aware that that position was subject to serious challenge and that it might remain liable to redeem the SVUs in the event Dresser-Rand was sold.

Also in 2003 Dresser-Rand had increased in value, and in the event of its sale the SVUs could have presented a substantial obligation on Ingersoll-Rand's part to the employees who held them. If an employee left Dresser-Rand before its sale, he or she would not be entitled to payment on account of his or her SVUs unless the termination was by reason of death, disability or retirement. But "those employees who [left] the Company for the reason [] of . . . retirement [would] receive a pro-rated award. . ."

Ingersoll-Rand was engaged in certain down-sizing operations. This involved, in the case of the <u>Bond</u> Plaintiffs, older employees who had been with the company for many years and were eligible for retirement and who would most likely take retirement either in anticipation of termination or when asked to go.

An analysis of the evidence concerning the termination of the <u>Bond</u> Plaintiffs establishes that Ingersoll-Rand engaged in a carefully designed plan: (1) to prevent the issue of the continued validity of the SIP from arising, (2) to make it appear that each departing employee was leaving solely because of a reduction in force and (3) to camouflage the fact that each of these employees was retiring.

The technique for avoiding the issue of the continuing validity of the SIP at the time of the terminations has been previously discussed. Had Ingersoll-Rand really wished to deal with that issue, it would have included in the release language a release of the SVU claims, potential claims that must have been in the forefront of its collective mind. Instead, the releases only

affected claims pending as of the date of the Agreements, and SVU claims were not pending because Dresser-Rand had not been sold.  Employees who anticipated receipt of payments on account of their SVUs in the event of the sale of Dresser-Rand, were led by the language of the Agreements' Other Benefits provision to believe that the SIP survived and would be honored.

The circumstances of the termination of the Bond Plaintiffs examined in their entirety disclose the efforts of Ingersoll-Rand to create an anticipatory defense to future claims on account of SVUs and to make it appear that these employees did not retire.

All of the Bond Plaintiffs were senior employees and eligible under existing Dresser-Rand programs to retire with pension, medical and insurance benefits.  The standard termination agreement sought to hide this situation.  In some cases its introductory paragraph, after reciting that the Agreement was "in response to your request to volunteer for a reduction in force," went on to state "[w]hile there is no formal Early Retirement Program. . ."  This introductory paragraph was used in connection with employees who had inquired about early retirement.  It is misleading in stating that it was in response to a request to volunteer for a reduction in force.  There was no such request and that language can only have been used by Dresser-Rand to strengthen its anticipatory defense that the departure was solely an account of a reduction in force.  The language was also misleading in that the company benefits did constitute an existing early retirement program, of which the departing employee was taking advantage.

In a number of ways Dresser-Rand massaged the Agreements to emphasize the fact that it was engaged in a reduction in force.  Its Employee Change Forms recited as a reason for the termination "Reduction-in-Force", although some of these forms also include the notation "Eligible for 'retiree' benefits."  Certain of the Agreements had appended to them a sheet entitled

27

"Additional Severance Information" which recited that the employee should evaluate the

severance programs "which is being offered in connection with the workforce reduction."  In one

instance (Douglas R. Keill) it appears that employees in the Personnel Department feared that

they had given an impression that Keill had retired (which, in fact he had).  In a "High"

importance" and "Confidential Sensitivity" memo Lori M. Stives wrote to Tony Edwards:

> Can you please confirm:
>
> 1.  that Douglas Keill did NOT retire? Redundancy.  He received a
> severance payment.  This payment was reduced due to his retirement
> date following in the coming 12 months.

In a number of instances the Agreement refers to the employee's request for early

retirement, but the related Employee Change Form recites "Involuntary RIF."

The employees intended to, and did, retire.  Despite Dresser-Rand's manipulation of the

language in the termination Agreements and certain related documents, Dresser-Rand's own

official documents make it abundantly clear that Dresser-Rand treated the <u>Bond</u> Plaintiffs as

having retired.  The numerous post-retirement communications from Dresser-Rand to the <u>Bond</u>

Plaintiffs, many of which are quoted in Part III above, refer to them as in retirement or as retirees

and proceed to treat them as such.

The fact that Dresser-Rand was engaged in a reduction in force is in no way inconsistent

with the <u>Bond</u> Plaintiffs' retirement.  The termination Agreements integration clause to the effect

that the Agreement sets forth the entire agreement does not preclude reliance on the SIP, because

the SIP comes within the Other Benefits provision of the termination Agreements.  Nor does the

fact that some of the <u>Bond</u> Plaintiffs sought unemployment benefits negate their retirement

status.  Retirees frequently seek new jobs to flesh out retirement benefits or simply because they

enjoy working.  Arthur E. Simmons's allegedly contradictory statements in a divorce proceeding do not affect his status as a retiree.  Claude Feder's inability to appear in New Jersey for deposition does not require dismissal of his claim.  Ingersoll-Rand had ample opportunity to question him if it seriously wished to do so.

The Court concludes that notwithstanding the fact that Dresser-Rand was engaging in a reduction in force, the undisputable facts establish that each of the <u>Bond</u> Plaintiffs left the Dresser-Rand for reason of retirement within the meaning of the SIP.

## V.  <u>The Release</u>

The use of the releases contained in the Severance Agreements in conjunction with the Other Benefits provisions has been discussed above.  The validity and scope of the releases has not been discussed.  The releases are broad, as far as they go:

> . . . any and all charges, complaints, claims, and liabilities of any kind suspected or unsuspected (hereinafter referred to as "claim or claims") which you at any time heretofore had or claimed to have or which you may have or claim to have regarding events that have occurred as of the date of this Agreement, including without limitation, any and all claims related or in any manner incidental to your employment with the Company or the termination therefrom.

A release is a writing that manifests an intention to discharge another from an existing duty.  <u>Model Plan Fin. Corp. v. Eagles</u>, 107 N.J.L. 452 (E. & A. 1931).  Releases are binding unless there is a showing of fraud, misrepresentation or over-reaching by the releasee.  <u>Bilotti v. Accurate Forming Corp.</u>, 39 N.J. 184 (1963).

"The scope of a release is determined by the intention of the parties as expressed in the terms of the particular instrument, considered in the light of all the facts and circumstances."  <u>Id</u>.

at 204.  "A general release, not restricted by its terms to particular claims or demands, ordinarily covers all claims and demands due at the time of its execution and within the contemplation of the parties."  Id. (citations omitted).

Questions of such intent cannot ordinarily be fairly disposed of on affidavits in a summary judgment application.  Breen v. Peck, 28 N.J. 351, 355 (1958) (citations omitted). "Claims or demands arising contemporaneously . . . are not discharged unless expressly embraced therein."  Bilotti, 39 N.J. at 204 (citation omitted).  "[O]ther jurisdictions . . . hold that a claim or obligation which did not pre-exist the release was not covered by it."  Id. (citation omitted).

Ingersoll-Rand claims that the releases in the Bond Plaintiffs' severance agreements apply to their SVU claims because they "(1) assert a liability allegedly owed by Ingersoll-Rand; (2) related to events that occurred as of the date of the Agreement - - e.g., Ingersoll-Rand's grant of SVUs years before . . . and (3) arise from the Releasing Claimants' employment with the company."

Although Ingersoll-Rand's obligation to honor the SVUs arose "from Releasing Claimant's employment with the Company," this was not an Ingersoll-Rand obligation at the time the releases were executed and did not relate to events that occurred as of the date of the releases because Dresser-Rand had not been sold.

Vince Volpe, President and CEO of Dresser-Rand testified that the SVU program was still in effect as of June, 2004.  Mr. Volpe had never seen any documents that suggested that the SVU program was not still in effect as of June, 2004.  He was surprised to hear from Herbert Henkel, the CEO of Ingersoll-Rand that Mr. Henkel believed that the SIP was expired.  Mr.

Volpe had never heard any conversation from anyone at Ingersoll-Rand saying that the SIP was not in effect and had never seen any documents suggesting that the SIP was not in effect.

Plaintiff, Thomas O'Leary on July 18, 2003 emailed Dresser-Rand Vice President Fred Conroy seeking confirmation that if he retired he would still be eligible for his pro-rated SVU payment under the retirement portion of the SIP.  On or about July 23, 2003 Mr. Conroy assured him verbally that he would receive payment under the SIP once Dresser-Rand was sold.

As of the date of the Severance Agreements there was no obligation to pay on account of the SVUs.  There was no claim to be released, and none would arise unless and until Dresser-Rand was sold.

Therefore, considered in the light of all the facts and circumstances, the Court concludes that there is no evidence to support a finding that either the <u>Bond</u> Plaintiffs or the company representatives who negotiated the severance agreements intended the releases to cover the SVU payments under the SIP.

A release ordinarily covers only claims and demands due at the time of its execution, unless the claim or demand is specifically named.  Although O'Leary tried to get a commitment in advance that his SVU would be paid, he was informed by Mr. Conroy that it would not be paid until Dresser-Rand was sold.  Therefore, it is clear that the SVUs were not due at the time of execution of the agreements because the sale of Dresser-Rand had not yet occurred.  This is further evidence that the scope of the releases did not contemplate the inclusion of the SVUs. Additionally, the releases in the Severance Agreements of the <u>Bond</u> plaintiffs do not specifically name the SIP or the SVU payment due under the SIP.  The Court, therefore, concludes that there is no evidence that contradicts the <u>Bond</u> plaintiffs' assertion that the SVUs were not within the

contemplation of the parties at the time the releases were negotiated and executed, and the SIP
and the SVUs are not covered by the releases signed.

Ingersoll-Rand moved for summary judgment in its favor on the claims of <u>Bond</u> Plaintiffs
Bond, Hughes, Kenville, Kneeland, Kruger, Kyttle, Mizzoni, Murphy, O'Leary, Reuland,
Simmons and Waggott on the ground that they left Dresser-Rand before its sale through an
involuntary or voluntary termination and not through retirement.  The court having found that
these Plaintiffs left Dresser-Rand through retirement, Ingersoll-Rand's motion for summary
judgment will be denied.

### VI.  <u>Conclusion</u>

In deference to Ingersoll-Rand's contention that it cannot fully present its case concerning
termination of the SIP until it completes discovery, the Court will defer ruling on that issue until
discovery is completed.  However, for certain practical considerations, the Court believes that it
should decide at this time issues on which it is prepared to rule.

Accordingly, (1) the <u>Bond</u> Plaintiffs' motion for summary judgment will be granted to the
extent that they seek a holding that their termination of employment with Dresser-Rand was a
retirement within the meaning of the SIP, and that they have not released any claims that they
may have under the SIP; (2) a ruling on the <u>Bond</u> Plaintiffs' motion for summary judgment that
the SIP has not terminated will be deferred; and (3) Ingersoll-Rand's motion for summary
judgment will be denied.


                               __*s/ Dickinson R. Debevoise*__
October 25, 2010               DICKINSON R. DEBEVOISE
                               U.S.S.D.J.

32