<u>**FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| WALTER NYE, ET AL, <br><br> Plaintiffs, <br><br><br> v. <br><br><br> INGERSOLL RAND COMPANY, <br><br> Defendant. | Consolidated Civ. No. 08-3481 (DRD) <br> Assoc. Civil Action Nos. 08-4260 and <br> 08-5371 <br><br> **O P I N I O N** |

*Appearances by:*

THE LANIER LAW FIRM, PLLC
by:     Richard D. Meadow, Esq.
          Evan M. Janush, Esq.
126 East 56th Street
6th Floor
New York, NY 10022

THE LANIER LAW FIRM, PC
by:     W. Mark Lanier, Esq.
          Eugene R. Egdorf, Esq.
          Kevin P. Parker, Esq.
6810 FM 1960 West
Houston, Texas 77069

          *Attorneys for Plaintiffs, Walter Nye, <u>et. al.</u>*

HELLRING LINDEMAN GOLDSTEIN & SIEGAL LLP
by:     Bruce S. Etterman, Esq.
One Gateway Center
Newark, NJ 07102

RUSTY HARDIN & ASSOCIATES
by:     Rusty Hardin, Esq.
        Ryans Higgins, Esq.
5 Houston Center
1401 McKinney, Suite 2250
Houston, TX 77010
        *Attorneys for Plaintiffs, Brown, et. al.*

SIMPSON THACHER & BARTLETT LLP
by:     Barry R. Ostrager, Esq.
        Lynn K. Neuner, Esq.
425 Lexington Avenue
New York, New York 10017

McCARTER & ENGLISH, LLP
by:     Anthony Bartell, Esq.
        Steven H. Weisman, Esq.
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

        *Attorneys for Defendant*

**<u>DEBEVOISE, Senior District Judge</u>**

This consolidated action incorporates three separate cases: <u>Nye, et. al. v. Ingersoll Rand Company</u>, Civ. No. 08-3481, <u>Brown, et. al. v. Ingersoll Rand Company</u>, Civ. No. 08-4260, and <u>Bond, et. al. v. Ingersoll Rand Company</u>, Civ. No. 08-5371. Plaintiffs, who number over one hundred, are each former employees of the Dresser-Rand Company ("Dresser-Rand"), a former subsidiary of Defendant Ingersoll-Rand Company ("Ingersoll Rand"). Plaintiffs allege that Defendant breached the terms of a Sales Incentive Plan ("2000 SIP") when it failed to pay them benefits due upon the sale of Dresser-Rand. Defendant claims both that the 2000 SIP expired prior to the sale and that by agreeing to a new incentive plan (the "2004 Plan") Plaintiffs surrendered their rights under the 2000 SIP. Plaintiffs contend, in part, that they were fraudulently induced into accepting the less generous 2004 Plan.

Presently before the Court are separate motions for Partial Summary Judgment from the <u>Nye</u> and <u>Brown</u> Plaintiffs, the <u>Bond</u> Plaintiffs, and Individual <u>Brown</u> Plaintiffs Johnson, Rostan, and Titus (the "Individual <u>Brown</u> Plaintiffs"). The <u>Nye</u> and <u>Brown</u> Plaintiffs seek an order declaring that: (1) the 2000 SIP did not expire; (2) the letters sent by Ingersoll Rand executives Henkel and Butler did not constitute a release or accord and satisfaction; (3) Ingersoll Rand's failure to pay benefits due under the 2000 SIP was a breach of the contract; (4) none of Ingersoll Rand's Affirmative Defenses are supported by the evidence; and (5) the Hanover Transaction, Volvo Transaction, and cash removed from Dresser-Rand by Ingersoll Rand should be included in calculating the gross sale price for Dresser-Rand.[1] The Individual <u>Brown</u> Plaintiffs seek an order holding that the 2000 SIP did not expire and that they should be treated as retirees for the purposes of determining eligibility for benefits under the 2000 SIP.

---

[1]     The <u>Bond</u> Plaintiffs also seek an order holding that the 2000 SIP did not expire. Since this is the only issue that remains from the <u>Bond</u> Plaintiffs' summary judgment motion, it will be addressed together with the discussion of the <u>Brown</u> Plaintiffs' motion.

Defendant claims that disputed issues of material fact exist which preclude any grant of summary judgment. Defendant has also filed a motion to bifurcate the trial into liability and damages phases. At oral argument, Defendant also suggested the possibility of limited "bellwether" trials as to liability. Plaintiffs have filed a motion to strike some of the evidence submitted by Defendant in connection with its opposition papers.

For the reasons set forth below, The Nye and Brown Plaintiffs' motion for partial summary judgment is GRANTED as to each liability issue except with respect to Brown Plaintiffs Rostan, Titus, and Johnson. The Nye and Brown Plaintiffs' motion for partial summary judgment is DENIED with respect to each damages issue. The Individual Brown Plaintiffs' motion is DENIED. Plaintiffs' motion to strike is GRANTED as to the expert reports and otherwise DENIED. Defendant's motion to bifurcate the trial is DENIED as moot.

## I.    BACKGROUND

The facts of this case stem from efforts by Ingersoll Rand to sell Dresser-Rand, a former subsidiary. The background of Defendant's efforts and the procedural history of the ensuing litigation are discussed at length in this court's prior Opinions. See, e.g., Doc. No. 355. The relevant facts are as follows.

In early 2000, Ingersoll Rand began to solicit buyers for Dresser-Rand, a recently acquired subsidiary.[2] To further that purpose and to achieve a desirable sale price for Dresser-Rand, Ingersoll Rand adopted the Sales Incentive Plan ("2000 SIP") (Pl. Ex. 3). The 2000 SIP was meant "to reward key employees for their contributions toward maximizing [earnings] and consequently, a desirable sale price for Dresser-Rand Company." Id. It did so by providing Sale Value Units ("SVUs") to select employees that would trigger payments from Ingersoll Rand

---

[2]      In the years prior to 2000, Ingersoll Rand had sought to divest itself of a partial interest in Dresser-Rand. Instead it was forced to acquire the entire subsidiary from Halliburton pursuant to a joint venture agreement.

once Dresser-Rand was sold. The size of the payments increased linearly with the ultimate sale price, in accordance with a predetermined formula.

The 2000 SIP included a section setting forth the duration of the agreement. That provision states, in its entirety:

> EFFECTIVE DATE
>
> The Plan is effective September 1 2000 and will remain in effect until Dresser-Rand Company is sold.

No other portion of the 2000 SIP provides any other limitation on the length of the agreement. Nor does the contract permit unilateral cancellation by either party. However a "Termination" provision reduces or eliminates awards for employees who leave Dresser-Rand before the company is sold. That provision states, in its entirety:

> TERMINATION
>
> An employee who voluntarily terminates or is involuntarily terminated by the company for any reason before the closing date of the sale, with the sole exceptions of death, disability, or retirement shall not receive or be entitled to any award from this plan. For those employees who leave the Company for the reason of death, disability or retirement will receive a pro-rated award based on the time they were actively employed during the period from the effective date of this plan to December 31, 2002. Any payment due will be made within 90 days from December 31 2002.

Awards under the 2000 SIP are calculated on the basis of a linear payout function which rewards sale prices above "$500MM net of retained liabilities and sale expenses." Payouts begin at $1.25 per SVU and increase to $13.58 at $600MM and $38.24 at $800MM. The 2000 SIP also provides that "[t]he sale of any major Dresser-Rand assets prior to the complete sale of the Company will be included in the overall net sale price. This overall net sale price will be used to determine the value of an SVU." Finally, the 2000 SIP contains a payment section which states,

5

in part, that "[a]ny award under this plan will be paid no later than 90 days following the closing date of the sale of Dresser-Rand Company."

While Ingersoll Rand executives were confident in 2000 that Dresser-Rand could be quickly sold, no suitable buyer was forthcoming. When Dresser-Rand could not be sold by the end of 2002, Ingersoll Rand abandoned its sale efforts. Several years past with no significant attempts to sell the subsidiary. Ingersoll Rand contends that during this time substantial efforts were made to integrate the two companies. Then, in 2004, Ingersoll Rand received an unsolicited offer from a potential buyer, First Reserve. In light of this new offer, management restarted the sales process and instructed its agents to formulate a deal.

In spite of the intervening years, executives at Ingersoll Rand were cognizant of 2000 SIP and the payout schedule that it mandated upon sale. While management wanted Dresser-Rand employees to continue to work hard and boost Dresser-Rand's financial performance, it also wished to limit the amount of money that it would be required to pay in the event that a sale was consummated. In addition, Ingersoll Rand did not want the defection or retirement of critical employees to jeopardize the sale. In this vein, Ingersoll Rand devised a new incentive plan (the "2004 Plan"). Various materials were prepared which highlighted the thrift of the new arrangement relative to the 2000 SIP. (Pl. Exs. 11, 12). The 2004 Plan was first announced to Dresser-Rand employees in a July 16, 2004 meeting between Herbert Henkel, CEO of Ingersoll Rand, and members of Dresser-Rand's executive staff.

Ingersoll Rand detailed the terms of the 2004 Plan in a letter distributed to Dresser-Rand employees at the meeting. Other similar letters were sent to a broader group of employees on

August 26, 2004. (Pl. Ex. 10, the "Henkel Letters"). [3] In each letter, Ingersoll Rand claimed that the 2000 SIP was no longer in effect, writing that "the sale value units awarded for 2001, 2002 and 2003 have expired, as have all rights under that plan." Id. The Henkel Letters promised cash, bonus opportunities, and in some cases stock options for employees who elected to enroll in the 2004 Plan. Id. The letters required the recipients to sign and return the letters promptly or they would not be eligible for the benefits. Employees receiving the letters were also instructed to keep them secret from others. No portion of the letters suggested that the recipients were giving up any rights by enrolling. However each letter contained language just above the signature line stating:

> To acknowledge your acceptance of the terms of this letter, please sign the enclosed duplicate copy in the space provided below and return it to Rob Butler by September 30, 2004. [4]

All of the Nye Plaintiffs signed and returned the Henkel letters. All of the Brown Plaintiffs except for Arthur Titus, William Rostan, and Gregg Johnson also signed the Henkel letters.[5]

On October 31, 2004, Ingersoll Rand sold Dresser-Rand to First Reserve for approximately $1.2 billion. After the sale was finalized, Ingersoll Rand paid Dresser-Rand employees the benefits due under the 2004 Plan. Enclosed with each benefit check was a cover letter from Robert Butler. (Pl. Ex. 23, the "Butler Letters"). The Butler Letters expressed gratitude to the employee and described the amount enclosed. The letters also stated:

---

[3]     There were several different versions of the August 26, 2004 letter that were sent to different Plaintiffs. However for the purposes of this motion, they contain substantially the same language.

[4]     The July 16, 2004 letter instead requested action by September 1, 2004. Several Plaintiffs requested and received extensions of the applicable deadline.

[5]     Titus, Rostan, and Johnson left Dresser-Rand well in advance of the Henkel letters—Titus and Johnson in 2003 and Rostan in early 2004.

> By endorsing this check you again agree, unconditionally and without reservation, that this payment represents payment in full for any and all amounts owed to you under the Program and its predecessors.

In 2005 Ingersoll Rand entered into litigation with a number of employees who had left the company prior to the sale date (the "Antoun" and "Barnett" actions) (Ingersoll Rand Company v. Barnett, et.al., and Antoun, et. al. v. Ingersoll-Rand, Consol. Civ. No. 05-1636 (DRD)). The Antoun and Barnett plaintiffs claimed that the 2000 SIP had not terminated and that as retirees, they were entitled to pro-rated benefits under the plan. On October 26, 2006, this Court ruled that the 2000 SIP had not expired and that the Barnett and Antoun Plaintiffs were each "retirees" as contemplated under the agreement. Following the decision, on January 15, 2008, both cases were dismissed pursuant to a confidential settlement.

The consolidated action currently before the court asserts claims for breach of the same agreement that was at issue in Antoun and Barnett— the 2000 SIP. However, unlike the retirees in Antoun and Barnett, many of the Nye and Brown plaintiffs worked for Dresser-Rand until it was sold.[6] Ingersoll Rand contends that by signing and returning the Henkel Letters and by endorsing the checks enclosed by the Butler Letters, the Plaintiffs surrendered any right to payment under the 2000 SIP. Plaintiffs contend that the Henkel and Butler Letters did not modify the 2000 SIP and that they were compelled to accept the 2004 Plan through a series of "threats and fraudulently inducing statements" from Ingersoll Rand. (Nye Second Amended Complaint 11) (Doc. No. 173).

On the basis of these facts, the Nye and Brown Plaintiffs move for partial summary judgment, seeking an order declaring that: (1) the 2000 SIP did not expire; (2) the letters sent by Ingersoll Rand executives Henkel and Butler did not constitute a release or accord and

---

[6]     In contrast, the Bond Action involves individuals who worked for Dresser-Rand at the time that the 2000 SIP was promulgated but left the company prior to the sale.

satisfaction; (3) Ingersoll Rand's failure to pay benefits due under the 2000 SIP was a breach of

the contract; (4) None of Ingersoll Rand's Affirmative Defenses are supported by the evidence;

and (5) the Hanover Transaction, Volvo Transaction, and cash removed from Dresser-Rand by

Ingersoll Rand should be included in calculating the gross sale price for Dresser-Rand.[7] The

Individual <u>Brown</u> Plaintiffs seek an order holding that the 2000 SIP did not expire and that they

should be treated as retirees for the purposes of determining eligibility for benefits under the

2000 SIP.

## II.    DISCUSSION

### A.    Standard of Review

Summary judgment is proper where "there is no genuine issue as to any material fact

and . . . the moving party is entitled to judgment as a matter of law." Rule 56(a). For an issue to

be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find

for the non-moving party." <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006). For a

fact to be material, it must have the ability to "affect the outcome of the suit under governing

law." <u>Id</u>. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary

judgment.

In a motion for summary judgment, the moving party has the burden of showing that no

genuine issue of material fact exists. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). When

the moving party does not bear the burden of proof at trial, the moving party may discharge its

burden by showing that there is an absence of evidence to support the non-moving party's case.

<u>Id.</u> at 325. If the moving party can make such a showing, then the burden shifts to the

---

[7]    Defendant spends seven pages of its brief discussing the <u>Nye</u> and <u>Brown</u> Plaintiffs'
fraudulent inducement claims and why they are not ripe for summary judgment. (Def. Br. 43-50).
While the Court finds these arguments persuasive, they are essentially irrelevant, since Plaintiffs
have not moved for summary judgment on the fraud counts. Curiously, Defendant acknowledges
this (Def. Br. 44 at note 26) and argues the issue anyway.

non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary. Id. at 324. In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact and do not merely suggest "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

A party must support its assertions that a fact cannot be or is genuinely disputed "by (A) citing to particular parts of materials in the record…or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Rule 56(c)(1). If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may…(2) consider the fact undisputed for purposes of the motion…" Rule 56(e).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but, rather, to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate.

The meaning of a contract may be decided by summary judgment where "the contract language is unambiguous and the moving party is entitled to judgment as a matter of law." Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 522 (3d Cir. 1999). However, to grant summary judgment, the court must "conclude that the contractual language is subject to only one reasonable interpretation." Id.; see also Tamarind Resort Associates v.

10

Government of Virgin Islands, 138 F.3d 107, 111 (3d Cir. 1998) ("a contract is unambiguous if it

is reasonably capable of only one construction").

Many of the issues facing the Court here involve the interpretation of an unambiguous

contract. Consequently summary judgment is appropriate. The Court will examine each of the

contentions raised by Plaintiffs in turn.

**B.      Did the 2000 SIP Expire?**

As detailed in the facts above, the 2000 SIP provides that: "[t]he Plan is effective

September 1, 2000 and will remain in effect until Dresser-Rand Company is sold." On its face,

this language appears to clearly state that the 2000 SIP will continue until the Dresser-Rand

company is sold regardless of when the sale is completed.

Whether the language of a contract is ambiguous is a matter of law. American Eagle

Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 587 (3d Cir. 2009) ("As a preliminary matter,

courts must determine as a matter of law which category written contract terms fall into-clear or

ambiguous") quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 613 (3d

Cir. 1995). A term is "ambiguous if it is subject to reasonable alternative interpretations." Taylor

v. Cont'l Group Change in Control Severance Pay Plan, 933 F.2d 1227, 1232 (3d Cir. 1991). In

determining whether a particular clause in a plan document is ambiguous, "the court should

begin with the plain language used in the contract" to determine whether, as a threshold matter,

"it is susceptible to different meanings." All Metro Health Care Services, Inc. v. Edwards, No.

C-334-07, 2010 WL 4054182, 3 (App. Div. 2010) quoting 11 WILLISTON ON CONTRACTS § 30:5

(4th ed.).

Ingersoll Rand advances two arguments in favor of ambiguity. It first argues that the

language governing the calculation of payments to terminated employees should be read to

suggest that the entire contract self destructs in December of 2002. (Def. Br. 7). Defendant also submits that the portion of the 2000 SIP which modifies existing stock option programs through 2003 should be read to suggest that the 2000 SIP expired in 2002. Id. at 8. Neither argument is persuasive.

As stated in this Court's October 26, 2006 Opinion in the Antoun and Barnett matter, Ingersoll-Rand's reliance on the "TERMINATION" section of the 2000 SIP is unavailing. That section does not provide for the termination of the 2000 SIP. Instead the section describes the calculation of benefits for "[a]n employee who voluntarily terminates or is involuntary terminated . . . before the closing date of the sale…" (Pl. Ex. 3). While this calculation involves "a pro-rated award… from the effective date of this plan to December 31, 2002", the use of this date does not support the conclusion that the entire plan expires on December 31, 2002. This language instead provides that SVUs vest on December 31, 2002 and that any retirees who remain with the company until that date are entitled to the full value of their SVUs upon sale. Vesting mechanisms are not uncommon in employee benefit contracts and do not implicitly override clear durational language in other parts of the agreement.[8]

The termination provision also states that "[a]ny payment will be made within 90 days from December 31, 2002." Again, this language speaks only to the mechanics of compensating

---

[8]     Such a conclusion would violate the "cardinal principle of contract construction: that a document should be read to give effect to all its provisions and to render them consistent with each other." Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 64 (1995); see also Cumberland County Improvement Authority v. GSP Recycling Co., Inc., 358 N.J. Super. 484, 497 (App. Div. 2003) (a contract "should not be interpreted to render one of its terms meaningless").

retired or deceased employees. The use of this date does not introduce any ambiguity as to the duration[9] of the 2000 SIP.

Defendant's second argument is equally unavailing. Ingersoll Rand suggests that by replacing Stock Appreciation Rights (SAR) and Stock Option awards with SVUs for 2001-2003, the 2000 SIP implies expiration at the end of 2002. But this does not follow. There is no default compensation structure that this Court must infer was intended. Performance incentive programs vary tremendously from business to business and can involve one-time awards, annual awards, discretionary awards, or any other structure that management chooses to invent. A particular allocation is suggestive of nothing, and nothing else in the 2000 SIP suggests that Ingersoll Rand was forced to choose between promising to award more SVUs each year and invalidating the SVUs that it had already awarded. Indeed, the 2000 SIP states that the bulk of SVUs were expected to be awarded by the end of 2000. Incentive plans are not cell phone contracts where benefits only "roll over" so long as more are purchased.

Finally, Defendant argues that "Ingersoll Rand intended that the SIP to expire on December 31, 2002." (Def. Br. 37). In its papers, Defendant tries valiantly to manufacture ambiguity through the introduction of extrinsic evidence that Ingersoll Rand expected to sell

---

[9]     The sentence does introduce ambiguity as to the proper date of payment. But this ambiguity has nothing to do with the duration of the plan. Even if the 2000 SIP expired in 2002, the payment of retired employees would still be unclear from the text. Consider the following example. An employee is awarded SVUs on September 1, 2000 and then retires on September 1, 2001. Dresser-Rand is sold on October 1, 2001. Both parties would agree that the employee is entitled to benefits under the 2000 SIP, but when are the benefits due? The "PAYMENTS" section states that "[a]ny award under this plan will be paid no later than 90 days following the closing date of the sale of the Dresser Rand Company", which implies that payment is due December 30, 2001. But the "TERMINATION" section states that "[a]ny payment will be made within 90 days from December 31, 2002", implying a due date of March 31, 2003—over a year later. The most likely conclusion would seem to be that the last sentence of the TERMINATION provision was included in error and should be read out of the agreement. But that question is not before the Court.

Dresser-Rand within two years.[10] But where—as here—the plain language of the contract is clear in its terms and imposes specific and definite obligations on the contracting parties, there is no ambiguity and no need for consideration of extrinsic evidence. While New Jersey law[11] permits this Court to consider extrinsic evidence "in determining the intent and meaning of the contract" this evidence cannot be used "to vary the [written] terms of the" agreement. Conway v. 287 Corporate Center Associates, 187 N.J. 259, 269-270 (2006); see also City of Orange Tp. v. Empire Mortg. Services, Inc., 341 N.J. Super. 216, 224 (App. Div. 2001) ("where the terms of a

---

[10]     This evidence includes multiple certifications to this effect by Ingersoll Rand employees (See Nettleton Cert. ¶¶4, 17, 20, Henkel Cert. ¶23, and Butler Cert. ¶4), initial drafts of the 2000 SIP which contained explicit expiration language (Def. Ex. 3), emails with various formulations of durational restrictions (Def. Exs. 4, 5), and a PowerPoint presentation that states broadly that the 2000 SIP would terminate when Ingersoll Rand decided that the sale process ended. (Def. Ex. 8). The Court is not required to examine this extrinsic evidence, and cannot judge its credibility in connection with this motion. However two points should be noted. First, the bulk of this evidence suggests that Ingersoll Rand considered and rejected the idea of putting explicit durational language in the 2000 SIP. Second, Plaintiffs also introduce significant extrinsic evidence suggesting that Ingersoll Rand was well aware that the 2000 SIP did not expire in 2002. See e.g. Pl. Ex. 2. at 291:19-292:12 (Elizabeth Powers admits that 2000 SIP contains no sunset provision); Pl. Ex. 4 at 167:14-168:2 (Robert Butler admits that he knew as of August 2000 that the 2000 SIP had no sunset provision); Pl. Ex. 11 (Ingersoll Rand document states that SVUs will pay in the event that the company is sold in 2003).

[11]     The Court looks here to the New Jersey substantive law of contracts. The 2000 SIP does not contain a choice of law provision, and the parties have not briefed the issue. However the interpretation of unambiguous contracts does not vary substantially from state to state. See e.g., AFBT-II, LLC. v. Country Village on Mooney Pond, Inc., 759 N.Y.S.2d 149, 150-151 (2d Dep't. 2003) ("When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations"); Balandran v. Safeco Ins. Co. of America, 972 S.W.2d 738, 745 (Tex. 1998) ("When the policy is not ambiguous on its face, extrinsic evidence may not be used to create an ambiguity."); Hutchison v. Sunbeam Coal Corp., 513 Pa. 192, 201 (1986) ("The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous."). In the absence of a conflict, the law of the forum governs. Rowe v. Hoffman-La Roche, Inc., 189 N.J. 615, 621 (2007) ("If there is no actual conflict, then the choice-of-law question is inconsequential, and the forum state applies its own law to resolve the disputed issue."). Moreover, as Ingersoll Rand has substantial presence within the forum state, it is likely that this Court would find New Jersey law to govern if there were a conflict. See, generally, RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971).

contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written."). Extrinsic evidence is appropriate when necessary to determine the meaning of ambiguous contractual language—it may not be used to flatly contradict that language.[12]

The text of the 2000 SIP is perfectly clear—the contract persists until Dresser-Rand is sold. This straight-forward language cannot be read to give rise to automatic expiration in 2002, no matter what extrinsic evidence is introduced. Consequently, the 2000 SIP did not expire and remained in effect until Dresser-Rand was sold in October of 2004.

**C.     Was the Henkel Letter a Release, Waiver or Accord and Satisfaction?**

Ingersoll Rand claims that Plaintiffs relinquished their rights to enforce the 2000 SIP by signing and returning the Henkel Letter. (Def. Br. 40). Plaintiffs respond that the Henkel Letter makes no mention of release or surrender of any contractual rights. (Pl. Br. 30-31). Indeed, the Henkel Letter asserts that the SVUs issued pursuant to the 2000 SIP have already long since "expired," suggesting that the signers have no rights to surrender. (Pl. Ex. 3).

The related doctrines of release, waiver, and accord and satisfaction govern situations where a party has surrendered the ability to vindicate a right or collect on a debt. A release is a writing that manifests an intention to discharge another from an existing duty. Model Plan Fin. Corp. v. Eagles, 107 N.J.L. 452 (E. & A. 1931). Releases are treated as contracts, for "a release is merely a form of contract and the general rules that apply to contract interpretation apply to releases." Domanske v. Rapid-American Corp., 330 N.J. Super. 241, 246 (App. Div. 2000). The

---

[12]     Ingersoll Rand argues that judgment cannot be granted on the contract without a searching trial inquiry into its subjective intent. But "subjective intent does not matter" where a contract is unambiguous. In re Nickels Midway Pier, LLC, 348 Fed. App'x. 781, 784 (3d Cir. 2009). Strictly speaking, contract interpretation is not about what the parties intended—it is about what they agreed to do. The former is relevant only to the extent that it illuminates the latter.

scope of a release is determined by "the intent of the parties to the release, with due consideration being given to whether the compensation paid was fully adequate." Cartel Capital Corp. v. Fireco of New Jersey, 81 N.J. 548, 559 (1980). In particular, "a release of a defendant will release him only in respect of those claims by those parties as are actually or intended to be encompassed thereby." Sweeney v. Sweeney, 405 N.J. Super. 586, 597 (App. Div. 2009). The Court of Appeals has repeatedly held that releases should be narrowly construed as to avoid injustice and forfeiture of claims. Carcaise v. Cemex, Inc., 200 Fed. App'x. 116, 125 (3d Cir. 2006) ("we endorse[] the 'rule of construction' that releases should be construed narrowly"); citing Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885 (3d Cir.1975). [13]

Accord and satisfaction is a similar doctrine under which a partial payment of a disputed debt is held to terminate the balance. Under New Jersey law, the elements of accord and satisfaction are: "(a) a bona fide dispute as to the amount owed; (b) a clear manifestation of intent by the debtor to the creditor that payment is in satisfaction of the disputed amount, and (c) acceptance of satisfaction by the creditor." TJD Architects v. Cervini's Auto Designs, 2010 WL 694561, *2 (App. Div. 2010). Again, actual knowledge of the right to collect upon a larger debt is critical, for "[a]bsent any knowledge that a larger amount is or may be owing, there is no basis for finding an accord and satisfaction through acceptance of what is later found to be less than the full amount owed." Connell v. American Funding Ltd., 231 N.J. Super. 409, 416 (Ch. Div. 1987).

---

[13]   Carcaise and Three Rivers were decided in accordance with Pennsylvania law. However no authority before the Court suggests that New Jersey contract law differs in this respect.

Waiver is a related doctrine that governs the unilateral surrender of a claim.[14] A waiver is any "intentional relinquishment of a known right." West Jersey Title & Guar. Co. v. Industrial Trust Co., 27 N.J. 144, 152 (1958). To be effective, a waiver "must be voluntary and there must be a clear act showing the intent to waive the right." Id. Furthermore, "waiver presupposes a full knowledge of the right and an intentional surrender; waiver cannot be predicated on consent given under a mistake of fact." County of Morris v. Fauver, 153 N.J. 80, 105 (N.J. 1998).

All three doctrines require that a party clearly surrender his or her claims, and as a consequence, none applies here. The Henkel letters do not state that Plaintiffs relinquish their rights under the 2000 SIP. The only reference to the plan is one of historical record, where it is reported by Ingersoll Rand that "the sales value units awarded for years 2001, 2002 and 2003 have expired, as have all rights under that plan." (Pl. Ex. 10).[15] Nothing in the document suggests that Plaintiffs are giving up anything. The words "have expired" do not effect the surrender of a right. Where a contractual right "expires" it does so through the progression of time, not through human acquiescence or agreement.

While the letters require that Plaintiffs acknowledge that they "have read the foregoing letter, understand it, and accept its terms" the expiration of the SVUs from the 2000 SIP is not presented as a "term" or "condition" of the 2004 Plan. Rather it is a fact represented by Ingersoll Rand that explains its decision to offer a new incentive compensation structure. Plaintiffs no more agreed to this representation through signature than they agreed to any of the other

---

[14]    In a nutshell, a release is an agreement between two or more parties to terminate a legal right through a written agreement. An accord and satisfaction is an agreement between two or more parties to terminate a legal right through a partial payment. A waiver is a unilateral termination of legal right by the party who possesses it.

[15]    The original version of the Henkel letter, as signed by Plaintiff Walter Nye, did not contain the last clause "as have all rights under that plan." This appears to have been added to the versions distributed on August 26, 2010.

explanations offered in the introductory paragraphs, such as "[s]ince 2002 much has changed at Ingersoll Rand", "the economic cycle, as well as the oil and gas industrial cycle, have moved out of their troughs", or that management "has been approached by a number of financial buyers expressing interest in a potential purchase of Dresser-Rand." These introductory statements by Ingersoll Rand are not presented as "conditions" or "terms" of the deal.

In contrast, the "terms" of the 2004 Plan are clearly identified. The Henkel Letters describe the "three components to the new program" in detail, highlighting cash payments, stock options, and bonus opportunities. Surrender of existing rights under the 2000 SIP is not identified as a "component" of the plan. Indeed, the Henkel letters clearly state that Plaintiffs have no rights under the 2000 SIP plan, ***whether or not they sign***. Plaintiffs argue that this representation was fraudulent, and have produced significant evidence that Ingersoll Rand deliberately lied to its employees in an effort to avoid living up to its contractual obligations.[16] Defendant has submitted evidence that Plaintiffs sought and obtained legal counsel to determine if they could collect under both plans and were not mislead by Ingersoll Rand's averments.[17] But regardless of whether the representation was fraudulent, it was false. Neither release nor accord and satisfaction will permit the forfeiture of a right that is not clearly identified, particularly though an instrument that mischaracterizes the existence of the right. See Zeller v. Markson Rosenthal & Co., 299 N.J. Super. 461, 463 (App. Div. 1997) ("The party seeking to settle for a less sum than

---

[16]     See, e.g., Pl. Ex. 2 (Powers Deposition) and Pl. Ex. 4 (Butler Deposition), both of which demonstrate that Ingersoll Rand executives were well aware that the 2000 SIP did not expire.

[17]     See, e.g., Def. Ex. 49, 50, 64, and 65, all of which demonstrate that Plaintiffs met with attorneys to determine what impact, if any, acceptance of the 2004 Plan would have on their ability to seek benefits under the 2000 SIP. It should be noted that Defendant provided its voluminous exhibits to the Court as an undifferentiated mass of paper, needlessly complicating the task of examining them.

is claimed to be due must, by his words or conduct when making the offer, clearly inform the other of what is sought and expected.").

Ingersoll Rand is a sophisticated entity represented by sophisticated counsel. If it wanted to condition the 2004 Plan on a release of claims under the 2000 SIP, it could have drafted clear language to do so.[18] Since it did not, this Court must "enforce the[] terms as written and … not fashion a better contract for the parties than they themselves made…." <u>Loigman v. Township Committee of the Tp. of Middletown</u>, 297 N.J. Super. 287, 301 (App. Div. 1997). The Henkel letter constitutes neither a release, nor a waiver, nor an accord and satisfaction.

**D.      Was the Butler Letter an Accord and Satisfaction?**

Unlike the Henkel letter, the Butler letter contains some of the indicia of a surrender of rights. The last paragraph of the document states that "[b]y endorsing this check you again agree, unconditionally and without reservation, that this payment represents payment in full for any and all amounts owed to you under the Program and its predecessors." (Pl. Ex. 23). Ingersoll Rand argues that the 2000 SIP represents a "predecessor" plan and that by accepting the payments due under the 2004 Plan the Plaintiffs forfeited their rights to collect anything under the original 2000 SIP. (Def. Br. 53-55). Indeed, Defendant calls the Butler letter a "quintessential example of an accord and satisfaction." <u>Id</u>. at 54.

However there are several flaws with this reasoning. First, it is not clear that the 2000 SIP is actually a "predecessor plan." The author of the Butler letter, Robert Butler, testified at deposition that "my position is that they're separate plans" and that "[o]ne was based on the sale price of Dresser-Rand, and the other was based on the fact of a sale of Dresser-Rand." (Pl. Ex.

---

[18]      Indeed, Plaintiffs have produced examples of clear releases drafted for Ingersoll Rand by its highly competent attoreys. Pl. Ex. 22.

4).[19] Moreover, the word predecessor implies substitution or succession by a successor.[20] The 2000 SIP was in effect at the same time as the 2004 Plan and had not been replaced. Without elimination of the 2000 SIP, it is hard to see how the 2004 Plan could be credibly deemed a successor.

Second, an accord and satisfaction requires that consideration be given as partial payment of the original debt. The checks distributed in connection with the Butler letter were for the amounts due under the 2004 Plan and no more. Ingersoll Rand was contractually obligated to pay these sums under the 2004 Plan. As a consequence they cannot serve as consideration for a separate agreement. Levine v. Blumenthal, 117 N.J.L. 23, 27 (1936) ("The principle is firmly imbedded in our jurisprudence that a promise to do what the promisor is already legally bound to do is an unreal consideration").[21] An accord and satisfaction cannot be sustained in the absence of consideration. Owens v. Press Pub. Co., 34 N.J. Super. 203, 212 (Law Div. 1955); see also Decker v. George W. Smith & Co., 88 N.J.L. 630, 632 (N.J. 1916) ("A consideration is necessary to render an accord and satisfaction valid."). A party may not effect an accord and

---

[19]     While all employee incentive plans share some common elements, Mr. Butler's comments touch on significant differences between the 2000 SIP and the 2004 Plan. These differences reflect the plans' divergent origins and purposes. The 2000 SIP, by its very terms, was designed to improve corporate profits in the hopes of attracting a high sale price from a strategic buyer. In contrast, the 2004 Plan was not tied to sale price and appears designed only to improve employee retention after the announcement that an offer had been made.

[20]     Predecessor comes through Middle English from the Latin *praedecessorem*. The root, *decedere* from which "decease" and "decedent" are also derived means "to depart" or "to die." Originally a *praedecessor* was the name given to the public official who held office before the current holder. In this case, the 2000 SIP neither died nor departed.

[21]     See also, Long v. Board of Chosen Freeholders of Hudson County, 16 N.J. Super. 448, 453 (App. Div. 1952) ("Since a debtor incurs no legal detriment by paying part or all of what he owes, and a creditor obtains no legal benefit in receiving it, such a payment if made at the place where the debt is due in the medium of payment which was due, and at or after maturity of the debt, is not sufficient consideration for any promise.") rev'd on other grounds 10 N.J. 380, 91 A.2d 724 (1952).

satisfaction as to a disputed debt merely by living up to its obligations under a subsequent and undisputed one.

Third, the Butler letters were not produced in connection with a "bona fide dispute as to the amount owed." TJD Architects, at *2. While Ingersoll Rand has introduced evidence that Plaintiffs doubted the expiration of the 2000 SIP at the time that the 2004 Plan was introduced, no reference is made in the Butler letters to the settlement of any dispute. Nor do the letters refer to the 2000 SIP by name.[22] Consequently, the letters do not provide sufficient clarity concerning the rights that Plaintiffs are alleged to have surrendered in exchange for payment. For an accord and satisfaction to be effective, "[t]he party seeking to settle for a less sum than is claimed to be due must, by his words or conduct when making the offer, clearly inform the other of what is sought and expected." Peterson v. Hartford Acc. & Indem. Co., 32 N.J. Super. 23, 31 (App. Div. 1954). A party must enter into an accord and satisfaction through volition, not ignorance, accident, or deceit. Connell, 231 N.J. Super. at 416 ("the essence of the concept is a knowing and deliberate decision to act in the described manner.").

Failing to meet each element as a matter of law, the Butler letters do not constitute an accord and satisfaction.

**E.      Did Ingersoll Rand Breach the 2000 SIP?**

In addition to its expiration and surrender arguments, Ingersoll Rand's papers set forth a number of miscellaneous defenses to its failure to pay money due under the 2000 SIP. The defenses include: (1) promissory estoppel; (2) frustration of purpose; and (3) lack of condition

---

[22]     A more "quintessential" accord and satisfaction would specify the obligation that it meant to extinguish.

precedent.[23] These defenses are little more than repackaged versions of the arguments addressed above and do not merit significant attention.

The doctrine of promissory estoppel permits the enforcement of gratuitous promises where "substantial hardship or injustice which would result if such a promise were not enforced." Pop's Cones, Inc. v. Resorts Intern. Hotel, Inc., 307 N.J. Super. 461, 469 (App. Div. 1998). Promissory estoppel requires four elements: "(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." Toll Bros., Inc. v. Board of Chosen Freeholders of County of Burlington, 194 N.J. 223, 253 (2008). As noted above, neither the Henkel letters nor the Butler letters contain a promise that Plaintiffs will not enforce their rights under the 2000 SIP. As such, promissory estoppel does not apply.

Frustration of purpose excuses non-performance under a contract where "after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary." Unihealth v. U.S. Healthcare, Inc., 14 F. Supp. 2d 623, 634 (D.N.J. 1998) quoting RESTATEMENT (SECOND) OF CONTRACTS § 265 (1981). Ingersoll Rand claims that sale of Dresser-Rand by December 31, 2002 was a "basic assumption" of the agreement and that when the sale did not occur the "fundamental purpose" of the contract was frustrated. This argument fails on almost every level. First, for the purpose of a contract to be frustrated "a change in circumstances [must] make[] one party's performance virtually worthless

---

[23]     Defendant appears to have abandoned its defenses of (4) lack of consideration; (5) expiration of the statute of limitations; (6) laches; and (7) and ratification. Defendant does not support these defenses through citation to evidence or make reference to them in its brief. As such, they will be STRICKEN.

to the other…." RESTATEMENT (SECOND) OF CONTRACTS § 265 (1981) at cmt a. In this case, the

2000 SIP was designed to increase employee retention and Dresser-Rand earnings. Increased

earnings and employee retention have objective worth to a business owner, even if the business

cannot be sold. Second, Dresser-Rand was eventually sold. Ingersoll Rand cannot credibly

contend that the sale was "virtually worthless" to it simply because it occurred later than was

desired.[24] Third, the sale of Dresser-Rand was substantially under the control of Ingersoll Rand.

Ingersoll Rand cannot be excused from its obligations under a contract due to the interference of

"an event" over which it had control.

　　A condition precedent is "either an act of a party that must be performed or a certain

event that must happen before a contractual right accrues or contractual duty arises." 13

WILLISTON ON CONTRACTS § 38:7 (4th ed.).[25] Conditions precedent are "disfavored by the

courts" and are to be enforced only where the "plain language" of a contract "compels the court

to do so…." Marsa v. Metrobank for Sav., F.S.B., 825 F. Supp. 658, 664 (D.N.J. 1993). Implied

conditions precedent are almost never found, and are applied only where "the state of the thing

or things which has been destroyed constituted such an essential and requisite element of the

agreement that its destruction or cessation demolishes the attainment of the vital and

fundamental purpose of the contracting parties, not merely one or a few of a variety of their

purposes." Edwards v. Leopoldi, 20 N.J. Super. 43, 55 (App. Div. 1952). Here, the 2000 SIP

---

[24]　　　In fact, Dresser-Rand was sold for almost twice what Ingersoll Rand expected to obtain from a buyer. As Plaintiffs pointed out in oral argument, the price was so much higher that it does not even appear on the payout chart distributed in connection with the 2000 SIP.

[25]　　　See also Moorestown Management, Inc. v. Moorestown Bookshop, Inc., 104 N.J. Super. 250, 262 (Ch. Div. 1969) ("A condition precedent is a fact or event occurring subsequently to the making of a valid contract and which must exist or occur before there is a right to immediate performance, before there is a breach of contract duty or before the usual judicial remedies are available.").

contained a clear condition precedent—the sale of Dresser-Rand. The purpose of the contract was to enable Defendant to sell Dresser-Rand. Dresser-Rand was sold. No argument advanced by Defendant supports expanding or narrowing the contours of this clear condition or finding that it has not been satisfied.

Ingersoll Rand does not claim that it made payments to Plaintiffs owed pursuant to the 2000 SIP within 90 days of the October 2004 sale. This Court has already found that the 2000 SIP was effective when Dresser-Rand was sold and that all of Ingersoll Rand's affirmative defenses fail. Consequently, Ingersoll Rand breached the 2000 SIP with respect to the <u>Nye</u>, <u>Brown</u>, and <u>Bond</u> Plaintiffs other than Titus, Rostan, and Johnson.

**F.      Is Mr. Titus Eligible as a Retiree?**

Plaintiff Titus was informed in October 2003 that his position was being eliminated as the result of a reduction in force (RIF). (Pl. Brown Br. 3). Titus was asked to remain with the company until certain projects were complete and left Dresser-Rand in March of 2004. <u>Id</u>. Ingersoll Rand has submitted deposition testimony that Mr. Titus was fired because of a severe mismanagement of inventory that cost the company millions of dollars. (Def. Brown Ex. 6). Mr. Titus himself testified that his departure was not voluntary. (Def. Brown Ex. 4). At the time of departure, Mr. Titus was 52 years old. (Def. Brown Br. 8). While he received severance at the time of departure, he was not eligible for retiree medical benefits and could not yet collect on his vested pension benefits.

Plaintiff Titus claims that he was a retiree because he was eligible to (eventually) collect on his vested pension benefits. (Pl. Brown Br. 3-4). This is a dubious argument. While this Court has ruled that other plaintiffs whose early retirements were characterized as RIFs by Ingersoll Rand are eligible for benefits under the 2000 SIP, no evidence has been presented that Plaintiff

Titus's departure was anything other than the involuntary termination of a worker that was not yet eligible to retire. These facts, together with the releases contained in Mr. Titus's severance agreement make any recovery by Mr. Titus pursuant to the 2000 SIP difficult. At a minimum, the evidence presented by Ingersoll Rand creates a genuine issue of material fact as to whether Plaintiff Titus left by reason of retirement as required under the 2000 SIP.

**G.      Is Mr. Rostan Eligible as a Retiree?**

Plaintiff Rostan was informed that he was being terminated in late July of 2003. (Pl. Brown Br. 4). Mr. Rostan testified that he was "complete[ly] surprise[d]" at the news and "did not volunteer" to lose his position. (Def. Brown Ex. 3). Mr. Rostan also referred to himself as a "victim of a reduction in force." Id. At the time of his departure, Mr. Rostan was 50 years old. While he received severance at the time of departure and COBRA health benefits through the remainder of the calendar year, Mr. Rostan was not eligible for retiree medical benefits and could not yet collect on his vested pension benefits. Id. at 15.

Like Titus, Plaintiff Rostan claims that he was a retiree because he will become eligible to (eventually) collect on his vested pension benefits. (Pl. Brown Br. 5). But like Titus, Plaintiff Rostan's departure was clearly an involuntary termination rather than an early retirement couched in RIF language and procedures. The evidence presented by Ingersoll Rand creates a genuine issue of material fact as to whether Plaintiff Rostan left by reason of retirement as required under the 2000 SIP.

**H.      Is Mr. Johnson Eligible as a Retiree?**

Plaintiff Johnson transferred from Dresser-Rand to Ingersoll Rand on September 1, 2003. (Pl. Brown Br. 12). He worked at Ingersoll Rand through the sale of Dresser-Rand in 2004 and left the company on October 19, 2007. Id. at 14. In connection with leaving Ingersoll Rand,

Johnson signed a Separation Agreement containing broad release language. Id. At the time of the transfer, Johnson was 44 years old.

Johnson contends that he was never terminated from Dresser-Rand because he instead transferred to Ingersoll Rand. (Pl. Brown Br. 12-13). This argument is tenuous at best. Termination, as it is used in the 2000 SIP, encompasses a variety of methods by which an employee's employment with Dresser-Rand could end. It explicitly includes quitting, firing, retirement, disability, and death, but nothing in the contract suggests that it is limited to these severance methods. Indeed, the construction of the termination section suggests that "termination" is synonymous with "leave the Company." It would be perfectly ordinary to read the termination language of the 2000 SIP as including any method by which an employee ceases to be employed by Dresser-Rand. At best, Johnson might argue that the language is ambiguous as to the impact of his "transfer" on his eligibility for 2000 SIP benefits. But at any rate, there are at least genuine issues of material fact as it whether he left by reason of retirement as required by the 2000 SIP.

## I.      Which Transactions Should be Included in the Dresser-Rand Sale Price?

The 2000 SIP bases its payouts on the "net sale price" of Dresser-Rand, adjusted to include money obtained from "[t]he sale of any major Dresser-Rand assets prior to the complete sale of the Company." (Pl. Ex. 3). The plan does not define "sale" or "major asset." Even once the "net sale price" and corresponding SVU values are calculated, each Plaintiff's damages must be adjusted for the total number of SVUs that he or she was awarded with additions for legal interest and pro-rations for the Bond Plaintiffs who retired prior to the sale. Consequently, damages calculations in this case will involve some complexity and require the evaluation of competing evidence.

In their papers, Plaintiffs ask for a ruling that that would explicitly include: (1) the 2000 sale of Dresser-Rand's compressor services division to Hanover Compression Company and Hanover Compression Inc.; (2) the 2002 sale of Dresser-Rand's DR-990 Aftermarket Business to Volvo Aero Corporation; and (3) cash removed from of Dresser-Rand by Ingersoll Rand in any calculation of the "net sales price." This requires a finding that each of these transactions constituted a "sale" of a "major asset."

Defendant has introduced substantial evidence that the Hanover sale took place prior to the 2000 SIP's effective date, including expert reports and exchange act filings from Hanover. (Def. Exs. 77: 6-8, 12; 79:10; 82, and 83). Plaintiffs contest this evidence[26] and have offered other documentary and testimonial evidence challenging it. Indeed, Plaintiffs acknowledge in their Rule 56.1 statement that the fact is in dispute. (Pl. SOF ¶ 26). When the transaction took place is clearly a material fact, and a genuine dispute over the credibility of the evidence is sufficient to defeat summary judgment on this issue.

In addition, Defendant has introduced evidence that the DR-990 Aftermarket Business sold to Volvo was not a "major asset" under the 2000 SIP. (Def. Maughan Cert. ¶¶16-21; Def. Ex. 77:13). Since the 2000 SIP does not define "major asset" the Court will need to look to extrinsic evidence to determine whether the DR-990 business qualifies. Plaintiffs themselves admit that this portion of the contract is not clearly defined. (Pl. Br. 65). Ambiguous contractual

---

[26]     Plaintiffs have filed a motion to strike portions of the certifications and expert reports submitted by Ingersoll Rand. With respect to the certifications, Plaintiffs contend that they are conclusory and contrary to documentary evidence and prior deposition testimony. However this goes to the credibility and/or weight of the evidence, which the Court will not examine in connection with the summary judgment motion. With respect to the expert reports, Plaintiffs are correct that they may not be properly submitted as exhibits to an attorney's certification. See Fowle v. C. & C Cola, 868 F. 2d 59, 67 (3d Cir. 1989). But in the interest of justice and basic fairness, Ingersoll Rand will be permitted to resubmit the expert reports, appropriately certified by their authors, within fourteen days of the entry of the order that accompanies this opinion.

language such as this is not properly resolved on a motion for summary judgment. <u>Diamond</u>, 180 F.3d at 522.

Last, Defendant contests whether the transfer of cash out Dresser-Rand was a "sale of a[] major Dresser-Rand asset[]" as used in the 2000 SIP. (Def. Br. 70). While it seems dubious that a cash transfer like the one described here would constitute the "sale" of anything, the ambiguity of the 2000 SIP on this point renders summary judgment inappropriate.

### III.   CONCLUSION

For the foregoing reasons, The <u>Nye</u> and <u>Brown</u> Plaintiffs' motion for partial summary judgment is GRANTED as to each liability issue, except with respect to <u>Brown</u> Plaintiffs Rostan, Titus, and Johnson. The <u>Nye</u> and <u>Brown</u> Plaintiffs' motion for partial summary judgment is DENIED with respect to each damages issue. The Individual <u>Brown</u> Plaintiffs' motion is DENIED. Plaintiffs' motion to strike is GRANTED with respect to the expert reports, which must be resubmitted, and otherwise DENIED. Since most liability issues have now been decided, Defendant's motion to bifurcate the trial is DENIED as moot.

The Court will enter an Order implementing this Opinion.


                                    s/ Dickinson R. Debevoise
                                    DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: May 10, 2011