**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| WALTER NYE, ET AL,<br><br>                              Plaintiffs,<br><br>v.<br><br><br>INGERSOLL RAND COMPANY,<br><br>                              Defendant. | Consolidated Civ. No. 08-3481 (DRD)<br>Assoc. Civil Action Nos. 08-4260 and<br>08-5371<br><br><br>**O P I N I O N** |

*Appearances by:*

THE LANIER LAW FIRM, PLLC
by:    Richard D. Meadow, Esq.
         Evan M. Janush, Esq.
126 East 56th Street
6th Floor
New York, NY 10022

THE LANIER LAW FIRM, PC
by:    W. Mark Lanier, Esq.
         Eugene R. Egdorf, Esq.
         Kevin P. Parker, Esq.
6810 FM 1960 West
Houston, Texas 77069

   *Attorneys for Plaintiffs, Walter Nye, <u>et. al.</u>*

HELLRING LINDEMAN GOLDSTEIN & SIEGAL LLP
by:    Bruce S. Etterman, Esq.
One Gateway Center
Newark, NJ 07102

RUSTY HARDIN & ASSOCIATES
by:   Rusty Hardin, Esq.
       Ryans Higgins, Esq.
5 Houston Center
1401 McKinney, Suite 2250
Houston, TX 77010
       *Attorneys for Plaintiffs, Brown, <u>et. al.</u>*

SIMPSON THACHER & BARTLETT LLP
by:   Barry R. Ostrager, Esq.
       Lynn K. Neuner, Esq.
425 Lexington Avenue
New York, New York 10017

McCARTER & ENGLISH, LLP
by:   Anthony Bartell, Esq.
       Steven H. Weisman, Esq.
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

       *Attorneys for Defendant*

**DEBEVOISE, Senior District Judge**

This consolidated action incorporates three separate cases: <u>Nye, et. al. v. Ingersoll Rand Company</u>, Civ. No. 08-3481, <u>Brown, et. al. v. Ingersoll Rand Company</u>, Civ. No. 08-4260, and <u>Bond, et. al. v. Ingersoll Rand Company</u>, Civ. No. 08-5371. Plaintiffs, who number over one hundred, are each former employees of the Dresser-Rand Company ("Dresser-Rand"), a former subsidiary of Defendant Ingersoll-Rand Company ("Ingersoll Rand"). Plaintiffs allege that Defendant breached the terms of a Sales Incentive Plan ("2000 SIP") when it failed to pay them benefits due upon the sale of Dresser-Rand. Defendant claims both that the 2000 SIP expired prior to the sale and that by agreeing to a new incentive plan (the "2004 Plan") Plaintiffs surrendered their rights under the 2000 SIP. The Court has granted summary judgment as to liability against Defendant with respect to all but three of the plaintiffs. (Doc. Nos. 355, 529). The claims of the remaining plaintiffs and the calculation of damages remain for a jury.

Presently before the Court are multiple motions concerning the upcoming trial. Plaintiffs have filed a motion to bifurcate the trial (Doc. No. 546), and a motion *in limine* to exclude testimony and evidence concerning the 2004 Plan. (Doc. No. 564). Defendant has filed a motion *in limine* to bar discussion of the gross sale price of Dresser-Rand for the purpose of computing damages. (Doc. No. 566). For the reasons set forth below, Plaintiffs' motion for bifurcation is DENIED. Plaintiffs' motion to exclude the 2004 Plan is GRANTED. Defendant's motion to exclude the gross sale price is GRANTED.

## I.     BACKGROUND

The facts of this case stem from efforts by Ingersoll Rand to sell Dresser-Rand, a former subsidiary. The facts of the case are long familiar to the parties and are discussed at length in this Court's prior Opinions. <u>See</u>, e.g., Doc. No. 355. The relevant facts are as follows.

In early 2000, Ingersoll Rand began to solicit buyers for a subsidiary corporation, Dresser-Rand. To improve performance at Dresser-Rand and obtain the best possible sale price for the company, Ingersoll Rand adopted the Sales Incentive Plan ("2000 SIP") (Doc No. 366-3).[1] The 2000 SIP was meant "to reward key employees for their contributions toward maximizing [earnings] and consequently, a desirable sale price for Dresser-Rand Company." It did so by providing Sale Value Units ("SVUs") to select employees that would trigger payments from Ingersoll Rand once Dresser-Rand was sold. The size of the payments increased linearly with the ultimate sale price, in accordance with a predetermined formula.

Awards under the 2000 SIP are calculated on the basis of a payout function which rewards sale prices above "$500MM net of retained liabilities and sale expenses." Payouts begin at $1.25 per SVU and increase to $13.58 at $600MM and $38.24 at $800MM. The sale price is subject to several modifications. In addition to reductions for banker fees and liabilities transferred to Ingersoll Rand, the 2000 SIP also provides that "[t]he sale of any major Dresser-Rand assets prior to the complete sale of the Company will be included in the overall net sale price. This overall net sale price will be used to determine the value of an SVU."

In spite of high hopes, subsequent efforts to sell Dresser-Rand initially failed. When the company could not be sold by the end of 2002, Ingersoll Rand temporarily abandoned its sale efforts. Years past without significant attempts to market the subsidiary to potential buyers. Then, in 2004, Ingersoll Rand received an unsolicited offer from a would-be acquirer, First Reserve. In light of this new offer, management restarted the sales process and instructed its agents to formulate a deal.

---

[1] This Opinion discusses many motions with separate certifications and exhibits. To prevent ambiguity the Court will, where possible, cite to docket entries.

In spite of the intervening years, executives at Ingersoll Rand were cognizant of 2000 SIP and the payout schedule that it mandated upon sale. While management wanted Dresser-Rand employees to continue to work hard and boost Dresser-Rand's financial performance, it also wished to limit the amount of money that it would be required to pay in the event that a sale was consummated. In addition, Ingersoll Rand did not want the defection or retirement of critical employees to jeopardize the sale. In this vein, Ingersoll Rand devised a new incentive plan (the "2004 Plan"). Various materials were prepared for Ingersoll Rand executives which highlighted the thrift of the new arrangement relative to the 2000 SIP.

Ingersoll Rand announced the terms of the 2004 Plan in a letter distributed to Dresser-Rand employees at a July 16, 2004 meeting. Other similar letters were sent to a broader group of employees on August 26, 2004 (the "Henkel Letters"). In each letter, Ingersoll Rand claimed that the 2000 SIP was no longer in effect, writing that "the sale value units awarded for 2001, 2002 and 2003 have expired, as have all rights under that plan." The Henkel Letters promised cash, bonus opportunities, and in some cases stock options for employees who elected to enroll in the 2004 Plan. The letters required the recipients to sign and return the letters promptly or they would not be eligible for the benefits. However no portion of the letters suggested that the recipients were giving up any rights by enrolling. All of the Nye Plaintiffs signed and returned the Henkel letters. All of the Brown Plaintiffs except for Arthur Titus, William Rostan, and Gregg Johnson also signed the Henkel letters.[2]

On October 31, 2004, Ingersoll Rand sold Dresser-Rand to First Reserve for approximately $1.2 billion. After the sale was finalized, Ingersoll Rand paid Dresser-Rand

---

[2] Titus, Rostan, and Johnson left Dresser-Rand well in advance of the Henkel letters—Titus and Johnson in 2003 and Rostan in early 2004.

employees the benefits due under the 2004 Plan, totaling approximately $23.5 million. In addition, approximately $11 million in stock options vested early due to the sale.

In 2005 Ingersoll Rand entered into litigation with a number of employees who had left the company prior to the sale date (the "Antoun" and "Barnett" actions) (Ingersoll Rand Company v. Barnett, et.al., and Antoun, et. al. v. Ingersoll-Rand, Consol. Civ. No. 05-1636 (DRD)). The Antoun and Barnett plaintiffs claimed that the 2000 SIP had not terminated and that as retirees, they were entitled to pro-rated benefits under the plan. On October 26, 2006, this Court ruled that the 2000 SIP had not expired and that the Barnett and Antoun Plaintiffs were each "retirees" as contemplated under the agreement. Following the decision, on January 15, 2008, both cases were dismissed pursuant to a confidential settlement.

The consolidated action currently before the court asserts claims for breach of the same agreement that was at issue in Antoun and Barnett— the 2000 SIP. However, unlike the retirees in Antoun and Barnett, many of the Nye and Brown plaintiffs worked for Dresser-Rand until it was sold.[3] Ingersoll Rand contends that the 2000 SIP expired prior to the sale of Dresser-Rand and that in any event, the Plaintiffs surrendered any right to payment under the 2000 SIP by accepting payments under the 2004 Plan. On October 25, 2010 and May 10, 2011, the Court issued a set of Opinions and Orders granting summary judgment with respect to liability on behalf of each of the Bond, Nye and Brown plaintiffs except for Titus, Rostan, and Johnson.[4]

---

[3] In contrast, the Bond Action involves individuals who worked for Dresser-Rand at the time that the 2000 SIP was promulgated but left the company prior to the sale.

[4] The October 25, 2010 Opinion held that the Bond plaintiffs were retirees as contemplated under the terms of the 2000 SIP. (Doc. No. 355). The May 10, 2011 Opinion held that the 2000 SIP had not expired, and that the Nye and Brown Plaintiffs were not estopped from collecting on it by virtue of their acceptance of the 2004 Plan. (Doc. No. 529). The status of Plaintiffs Titus, Rostan, and Johnson and the appropriate measure of damages for all Plaintiffs were held to require the adjudication of disputed issues of material fact. Id.

Trial of this matter is currently scheduled for October. In preparation for trial, the parties have filed a series of motions concerning the structure of the proceedings and the scope of permissible argument.[5] Plaintiffs have filed a motion to bifurcate[6] the trial, in effect seeking to obtain a damages verdict before the presentation of evidence concerning potential Ingersoll Rand liability to plaintiffs Titus, Rostan, and Johnson. Plaintiffs have also filed a motion *in limine* seeking to preclude Ingersoll Rand from arguing that payments made pursuant to the 2004 Plan may be deducted from damages owed under the 2000 SIP. In turn, Defendant has filed a motion *in limine* seeking to bar any argument that the proper value of an SVU under the 2000 SIP should be calculated using a "gross sale price" rather than a "net sale price."

## II. DISCUSSION

### A. Reverse Bifurcation

Under Rule 42(b), a court is empowered to "order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims" in circumstances where it will maximize "convenience", "avoid prejudice", or "expedite and economize" the resolution of the case. While the organization of trial is within the broad discretion of the court, the advisory committee notes to Rule 42 caution that "separation of issues for trial is not to be routinely ordered" and encourages bifurcation only "where experience has demonstrated its worth." Advisory Committee Note to the 1966 amendment of Rule 42(b), 39 F.R.D. 113.

---

[5] The parties have, appropriately, filed many more *in limine* motions than those discussed here. The remaining motions, most of which concern the admissibility of expert testimony, will be argued and adjudicated closer to trial. The parties have agreed that the current crop of motions contain those which bear most on their trial preparation and from which they will derive the most benefit from a swift decision.

[6] Strictly speaking, Plaintiffs' style their motion as one for "reverse bifurcation" of the trial. Reverse bifurcation is "the inevitable obfuscatory jargon coined by lawyers and judges to describe the trial of a case where damages are established first and liability second." In re Report of Advisory Group for the United States District Court for the District of Maine Appointed Under the Civil Justice Reform Act of 1990. 1993 WL 30497, *52 (D.Me. Feb 1, 1993).

Courts considering bifurcation of the type requested here, where damages are established before liability is found, have characterized the proceeding as "extraordinary", and "drastic."[7] Consequently, while so-called reverse bifurcation has found some favor in the arena of complex personal injury torts[8], it remains relatively uncommon in ordinary litigation.[9]

A party seeking bifurcation "has the burden of demonstrating that judicial economy would be promoted and that no party would be prejudiced by separate trials." Princeton Biochemicals Inc. v. Beckman Instruments Inc., 180 F.R.D. 254, 256 (D.N.J. 1997). Bifurcation is appropriate "where there will be little overlap in testimony and evidence between the two proceedings, where the issues to be decided at trial are complex and the factfinder is likely to become confused, where bifurcation will promote settlement, and where a single trial will cause unnecessary delay." Rodin Properties-Shore Mall v. Cushman & Wakefield of Pa., Inc., 49 F.Supp.2d 709, 722 (D.N.J. 1999).

Plaintiffs advance five arguments in favor of reverse bifurcation. First, Plaintiffs argue that the issues of liability and damages are fundamentally distinct and are unlikely to involve

---

[7] See e.g., Campolongo v. Celotex Corp., 681 F.Supp. 261, 262 (D.N.J. 1988) ("The magnitude of the problem invites the employment of extraordinary case management techniques"); Walker Drug Co., Inc. v. La Sal Oil Co., 972 P.2d 1238, 1245 (Utah 1998) ("To our knowledge, so drastic a technique has never been employed in Utah.").

[8] See e.g., Borman v. Raymark Industries, Inc., 960 F.2d 327 (3d Cir. 1992) (reverse bifurcation in asbestos case); Angelo v. Armstrong World Industries, Inc., 11 F.3d 957 (10th Cir. 1993) (same).

[9] Walker Drug Co., 972 P.2d at 1245 ("reverse bifurcation is much less common and has been used only rarely in complex asbestos-related litigation"); Moss v. Associated Transport, Inc., 344 F.2d 23, 25 (6th Cir. 1965) ("Some look upon the practice as but another procedural 'gimmick' designed to assist current judicial efforts to mass produce dispositions of pending cases, but which merely multiplies the burdens of litigation. They feel that the occasional good it produces is greatly outweighed by the danger of unfairness being visited upon litigants who from right motives prefer to try their suits in the traditional fashion.").

substantial amounts of the same evidence or witness testimony. (Doc. No. 545 at 3-4). Second, Plaintiffs argue that a damages trial might encourage settlement, obviating the need to hold a liability trial at all. Id. at 4. Third, Plaintiffs contend that Ingersoll Rand effectively waived its right to object to reverse bifurcation by moving for a bifurcated trial before this Court's May 10, 2011 summary judgment decision. Id. Fourth, Plaintiffs argue that holding a single trial will "unnecessarily delay" the case for the 127 plaintiffs for whom liability has already been found. Id. Last, Plaintiffs caution that an integrated trial poses a "very real" risk of juror confusion due to the complexity of the issues involved. Id. at 9.

None of these arguments are persuasive, particularly in light of the prior submissions of Plaintiffs in connection with Defendant's earlier motion for bifurcation. (Doc. No. 491). For example, on the issue of jury confusion Plaintiffs previously wrote:

> Counsel is[sic] this case are assuredly able to present their testimony in such a way for the jury to understand how it applies to either liability damages or both. Indeed, IR's able counsel has already demonstrated its ability to do so in its brief on bifurcation which cogently explains their view as to which witnesses will be testifying on which issues. Plaintiffs' counsel are likewise confident of their ability to avoid jury confusion and to present their case in such a way that the jury will understand which evidence pertains to liability, which evidence pertains to damages and which evidence pertains to both.

(Doc. No. 506 at 12).[10]

Since counsel wrote those words, the resolution of multiple matters on summary judgment have rendered this case less complicated and confusing, not more. As such, Plaintiffs' claim that bifurcation is necessary to prevent juror confusion rings hollow. Moreover, any substantial

---

[10] Plaintiffs argue that Defendant has also altered its position, having once advanced many of the same arguments in support of bifurcation that Plaintiffs now advance in support of reverse bifurcation. (Doc. No. 545 at 6, 7, 9). But any argumentative chicanery by Defendant is irrelevant. Defendant is not required to prove that an ordinary trial of all claims is preferable— rather Plaintiffs have "the burden of demonstrating that judicial economy would be promoted and that no party would be prejudiced by separate trials." Princeton Biochemicals, 180 F.R.D. at 256.

alteration of the natural order of a trial, particularly one which requires the jury to render partial seriatim verdicts may itself be a source of confusion or error. In setting the order of presentation, the Court is obligated to avoid recourse to complex jury instructions "capable of confusing and thereby misleading the jury." United States v. Fischbach and Moore, Inc., 750 F.2d 1183, 1195 (3d Cir. 1984).

Nor do Plaintiffs demonstrate that significant time or money could be saved by slicing the trial apart and suturing it back together. As a threshold matter, altering the order in which witnesses are called or documents are presented is unlikely to change the total time necessary to introduce such evidence to the jury. Indeed, the "background" information concerning Ingersoll Rand, Dresser-Rand, Plaintiffs, and the 2000 SIP necessary for the jury to understand the damages evidence may overlap substantially with liability evidence, resulting in duplicative testimony later in the trial. And there is no reason to believe that a damages verdict will lead to complete settlement. Plaintiffs Titus, Rostan, and Johnson face serious challenges to their claims against Ingersoll Rand. Plaintiffs offer no real reason why Ingersoll Rand would abandon potentially meritorious defenses even after a significant damages verdict.

In addition, Plaintiffs' argument that "a single trial which addresses damages for all Plaintiffs and SIP-eligibility for 3 Plaintiffs would cause unnecessary delay for 127 of 130 Plaintiffs" also strains credulity. As counsel are well aware, none of the plaintiffs are likely to recover until post trial motions and/or appeals are complete, none of which will be commenced until after all jury findings are made, no matter the order in which they are requested. And even if damages were forthcoming on the day of verdict, the liability evidence concerning plaintiffs Titus, Rostan, and Johnson would delay payment by days, not weeks.

Plaintiffs' arguments are unavailing and their solution risks more problems than it solves. Plaintiffs' motion to bifurcate the trial is DENIED.

**B.      Gross vs. Net Sale Price Calculation**

Plaintiffs seek to argue that the gross sale price should be used by the jury in calculating the value of each SVU and consequently the damages owed to Plaintiffs under the 2000 SIP. Defendant opposes the introduction of any argument or evidence concerning the gross sale price of Dresser-Rand, arguing that the plan value is explicitly based upon the net sale price. Defendant has moved *in limine* to bar any argument or evidence by Plaintiffs on this issue.

The 2000 SIP contains a section detailing how the dollar value of each SVU may be determined upon the sale of Dresser-Rand. That section states as follow:

> PERFORMANCE MEASUREMENT
>
> The value of the Dresser-Rand Sale Incentive Plan is based on one component; the net sale price of Dresser-Rand Company. The threshold net D-R sale price for the success pool payout curve to start payment above a base of $1.25 per SVU is a sale price of $500MM net of retained liabilities and sale expenses as determined by Ingersoll-Rand Controller's office. The payout curve starts with an SVU value of $1.25 that will be paid for any sales value. The payout is only for a successfully completed sale as' determined by IR of Dresser-Rand Company.
>
> The success pool (payout curve) generated will be paid based on the Net proceeds from the sale of D-R as summarized below:
>
> - Gross Selling Price/Proceeds
> - Less all transaction fees; such as:
>     - Fees paid to investment bankers
>     - Amounts paid to bankers or others to finance the sale
>     - Other transaction fees
> - Less any liabilities associated with D-R that are assumed by Ingersoll-Rand Company
>
> Note: In the event IR accepts a note receivable or other equity as part of the sale it will have no consequence on the above calculation of net proceeds.
>
> The relationship between sale price and the value of an SVU is linear. Chart 1 describes the payout curve for this component.

11

2000 SIP (Doc. No. 566-3 at 1).

This provision unambiguously provides that SVU values are calculated based on "the net sale price of Dresser-Rand Company." As Defendant points out in its brief, the word "net" appears seven times and is even capitalized and underlined for emphasis. (Doc. No. 566 at 2). There is absolutely no language in the agreement suggesting that payouts should be calculated based on the gross sale price. The word "gross" appears only in reference to how the net price should be determined.

Finding that words fail them, Plaintiffs attempt to argue almost exclusively through pictures. The sole basis for Plaintiffs' argument that they should be permitted to calculate recoveries based on the gross sale price of Dresser-Rand is a chart that appears on the last page of the 2000 SIP. That chart, illustrating the 2000 SIP payout curve, is reproduced in total below.



Plaintiffs assert that because this chart does not contain the word "net," the jury should be permitted to ignore the seven other times that the 2000 SIP explicitly states that the payout curve is to be calculated net of all transaction fees and assumed liabilities. This position is not credible. Like many charts, the above graphic contains numerous abbreviations and simplifications. For example, Dresser-Rand is abbreviated "D-R," and "million" is abbreviated "MM." But the use of commonsense abbreviations to map the terms of a written contract into a visual chart does not itself create ambiguity in the contract. The chart no more suggests that "gross price" is the intended benchmark than it suggests that the sale price of some hypothetical "D-R, Inc." should be the relevant guidepost or that SVU compensation to Plaintiffs is to be paid in hundredths of a chocolate candy treat.

Plaintiffs also point to deposition testimony, witness certifications, and Ingersoll Rand documents which purportedly bolster their argument that the parties "intended" the gross sale price to be the starting point for 2000 SIP benefits. As the parties are well aware, extrinsic evidence may not be used "to vary the [written] terms" of an unambiguous agreement. Conway v. 287 Corporate Center Associates, 187 N.J. 259, 269-270 (2006). But even consideration of this evidence does not change the result. The Court has reviewed the exhibits submitted by Plaintiffs and finds nothing on which a jury could properly conclude that the parties intended to use the gross sale price rather than the net.[11]

---

[11] The "evidence" submitted by Plaintiffs consists largely of documents and testimony in which Ingersoll Rand employees refer to the sale price when discussing estimated payouts under the 2000 SIP without specifying whether the gross or net sale price is intended. This is not surprising, given that sale expenses in this sort of transaction are often: (1) small in comparison to the total sale price; and (2) difficult to estimate in advance of the closing. Nor is it incumbent on Ingersoll Rand employees to use legally precise language in all internal documents and communications.

Under Rule 403, evidence, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. The Rule directs the court to perform a "cost/benefit analysis" concerning the likely proper and improper uses of the proffered material and exclude evidence where "its probative value is not worth the problems that its admission may cause." Coleman v. Home Depot, Inc., 306 F.3d 1333, 1344 (3d Cir. 2002). In this vein, it is possible that argument concerning the gross sale price of Dresser-Rand might, if cloaked in the veneer of expert opinion and zealous advocacy, confuse or mislead the jury as to the appropriate measure of damages. Given the tenuous nature of the evidence, the more likely outcome is that these arguments will simply waste time in what already promises to be a lengthy and complicated trial. But in either case, the probative value of the evidence is minimal and substantially outweighed by the potential for prejudice, confusion and waste of time. Defendant's motion to bar evidence or argument that SVU value is based on the gross sale price of Dresser-Rand is GRANTED.

C.   **Admissibility of the 2004 Plan**

Throughout this litigation, Defendant has attempted to avoid payment on the 2000 SIP by invoking the 2004 Plan. Defendant has alternatively characterized the 2004 Plan as evidence of the "expiration" of the 2000 SIP, as a waiver of Plaintiffs' rights, as an accord and satisfaction, and as various other legal talismans designed to avoid liability. In its May 10, 2011 Opinion, this Court found that none of these charms was effective and that Ingersoll Rand was liable to Plaintiffs for unpaid benefits due under the 2000 SIP.

Now, in opposition to Plaintiffs' motion *in limine* to exclude evidence of the 2004 Plan as irrelevant and prejudicial, Defendant recharacterizes the 2004 Plan yet again. Ingersoll Rand now

claims that payments under the 2004 Plan "are unquestionably sales expenses" as contemplated under the 2000 SIP. (Doc. No. 571 at 2). In other portions of its brief, Defendant modifies this argument slightly, asserting instead that the payments are "undoubtedly sales expenses and retained liabilities…." Id. at 7. Regardless of how the payments are characterized, Defendant argues that any payments made under the 2004 Plan should be deducted from the gross sale price of Dresser-Rand before any damages are calculated. Id. Alternatively Defendant argues that payments made to Plaintiffs specifically should be subtracted from any damages awards.

While novel, this argument is unsubstantiated by evidence and finds no support in either the language of the 2000 SIP or the plain meaning of "sales expense." In determining the net sales price of Dresser-Rand, the 2000 SIP permits Ingersoll Rand to deduct only two categories of expenses. The first are "sales expenses" or "transaction fees" which are characterized as:

- Fees paid to investment bankers
- Amounts paid to bankers or others to finance the sale
- Other transaction fees

This definition is in keeping with the ordinary meaning of "sales expenses" as fees paid to financial entities or other specialized venders in connection with closing a sale. It is also in keeping with the accounting opinion submitted by Plaintiffs which characterizes "costs to sell" as incremental direct costs paid to an unrelated party. (Doc. No. 522-5). The payments made under the 2004 Plan fall well outside this narrow category of payments. Ingersoll Rand can point to no case where a "sales expense" was held to include substantial benefits payments due under a separately negotiated compensation agreement. Nor has it offered any documentary evidence, expert testimony, or learned treatise suggesting that "sales expense" is ever used in this manner.

It would hardly matter if it could; as defined under this contract the 2004 Plan simply does not apply.[12]

The second category of deductions include "liabilities associated with D-R that are assumed by Ingersoll-Rand Company." There is no support for the position that payments due under the 2004 Plan constitute "retained liabilities" of Dresser-Rand. The 2004 Plan is a contract between Ingersoll Rand and Dresser-Rand Employees. Dresser-Rand is not a party to the agreement. The options which vest early pursuant to the plan are options on Ingersoll Rand stock. The letter setting forth the terms of the 2004 Plan is written on Ingersoll Rand letterhead by Ingersoll Rand's then Chairman, President, and CEO, Herbert Henkel. Defendant argues that "Ingersoll Rand 'assumed' these particular 2004 Plan liabilities by not passing these obligations on to FRC along with Dresser-Rand as part of the sale" (Doc. No. 571 at 9) but it has introduced no evidence that these liabilities ever belonged on the Dresser-Rand balance sheet to begin with. It is not sufficient for Defendant to posit an alternate world where Ingersoll Rand assigned liabilities to Dresser-Rand in connection with a radically different sales agreement. Under the plain language of the 2000 SIP, Ingersoll Rand may only deduct actual Dresser-Rand liabilities that it actually assumed.

Plaintiffs suggest that Ingersoll Rand wants to admit evidence of the 2004 Plan in an effort to convince the jury that Plaintiffs have already been sufficiently compensated and are attempting to greedily double dip on performance benefits. Ingersoll Rand all but admits as much, with repeated references in its brief to the need for "equity" to guide the jury's findings. Indeed, Defendant claims that "[f]undamental principles of equity also dictate that Plaintiffs should not be permitted to recover under the SIP without any consideration for the amounts they

---

[12] Indeed, if the Court were to adopt Ingersoll Rand's position there would be little reason to stop with the benefits paid under the 2004 Plan. The forthcoming payments under the 2000 SIP would be doubtlessly entitled to similar treatment as "sales expenses."

16

already received under the 2004 Plan." (Doc. No. 571 at 2). However this Court has already ruled that the 2000 SIP and 2004 Plan represented separate compensation agreements with different objectives and incomplete overlap in beneficiaries. These agreements give rise to entirely separate legal obligations which bind Ingersoll Rand.

If "double recovery" or "inequity" results from this situation, it is an injustice entirely of Defendant's making. Had Ingersoll Rand chosen to do so, it could have simply paid benefits under the 2000 SIP after the sale to First Reserve. Alternatively, it could have conditioned acceptance of the 2004 Plan benefits on an explicit surrender of rights under the 2000 SIP. It chose not to do so, possibly because any demand for an explicit waiver would have undermined its claims that the 2000 SIP had "expired." Instead, Ingersoll Rand told Plaintiffs that their claims under the 2000 SIP were expired and useless and offered them a new plan in the hopes that they would not object. Having deliberately set forth down this road, Ingersoll Rand can hardly complain about where it leads.

### III.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion for bifurcation is DENIED. Plaintiffs' motion to exclude the 2004 Plan is GRANTED. Defendant's motion to exclude the gross sale price is GRANTED.

The Court will enter an Order implementing this Opinion.


s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: September 8th, 2011