**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WALTER NYE, ET AL, <br><br> Plaintiffs, <br><br> v. <br><br> INGERSOLL RAND COMPANY, <br><br> Defendant. | Consolidated Civ. No. 08-3481 (DRD) <br> Assoc. Civil Action Nos. 08-4260 and 08-5371 <br><br> **O P I N I O N** |

*Appearances by:*

THE LANIER LAW FIRM, PLLC
by:     Richard D. Meadow, Esq.
         Evan M. Janush, Esq.
126 East 56th Street
6th Floor
New York, NY 10022

THE LANIER LAW FIRM, PC
by:     W. Mark Lanier, Esq.
         Eugene R. Egdorf, Esq.
         Kevin P. Parker, Esq.
6810 FM 1960 West
Houston, Texas 77069

　　*Attorneys for Plaintiffs, Walter Nye, et. al.*

HELLRING LINDEMAN GOLDSTEIN & SIEGAL LLP
by:     Bruce S. Etterman, Esq.
One Gateway Center
Newark, NJ 07102

RUSTY HARDIN & ASSOCIATES
by:   Rusty Hardin, Esq.
        Ryans Higgins, Esq.
5 Houston Center
1401 McKinney, Suite 2250
Houston, TX 77010
   *Attorneys for Plaintiffs, Brown, et. al.*

SIMPSON THACHER & BARTLETT LLP
by:   Barry R. Ostrager, Esq.
        Lynn K. Neuner, Esq.
425 Lexington Avenue
New York, New York 10017

McCARTER & ENGLISH, LLP
by:   Anthony Bartell, Esq.
        Steven H. Weisman, Esq.
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

   *Attorneys for Defendant*

**DEBEVOISE, Senior District Judge**

This consolidated action incorporates cases brought by similarly situated Plaintiffs: <u>Nye, et. al. v. Ingersoll Rand Company</u>, Civ. No. 08-3481, <u>Brown, et. al. v. Ingersoll Rand Company</u>, Civ. No. 08-4260, and <u>Bond, et. al. v. Ingersoll Rand Company</u>, Civ. No. 08-5371. Plaintiffs are one hundred thirty former current and former employees of the Dresser-Rand Company ("Dresser-Rand"), a former subsidiary of Defendant Ingersoll-Rand Company ("Ingersoll Rand"). Plaintiffs allege that Defendant breached the terms of a Sales Incentive Plan ("2000 SIP") when it failed to pay them benefits due upon the sale of Dresser-Rand. The Court has granted summary judgment as to liability against Defendant with respect to all but three of the plaintiffs. (Doc. Nos. 355, 529). The claims of the remaining plaintiffs and the calculation of damages remain for a jury.[1]

Presently before the Court are multiple motions concerning the upcoming damages trial. Plaintiffs have moved to exclude Defense experts Dale Kitchens, Stuart Pachman, and David Smalstig. Plaintiffs have also moved to: (1) preclude the use of late-produced documents; (2) preclude the use of amended interrogatories; (3) exclude evidence that the SIP expired; (4) exclude evidence that Plaintiffs investigated legal options concerning the SIP before accepting the 2004 Plan; (5) exclude extrinsic evidence which varies the terms of the SIP and Hanover Purchase Agreement Contracts; (6) exclude the video depositions of Sammy Antoun and John Gallagher; (7) exclude evidence related to taxes, capital contributions or pre-paid insurance write-offs that Ingersoll Rand wishes to deduct from the gross sale price; (8) exclude the 2005 Estimated FAS 106 Expense document; and (9) preclude testimony or argument concerning Plaintiffs' compensation after the sale of Dresser-Rand.

---

[1] In evaluating the logistical difficulties in selecting and instructing a jury as to liability and damages, the Court has decided to separate the issues for trial. The damages trial will be held first, on November 15th.

3

In turn, Defendant has moved to exclude Plaintiffs' expert John Cherpock. In addition, Defendant has moved to: (1) exclude evidence of inter-company cash transfers; (2) preclude comparisons between the Bond Plaintiffs and Plaintiffs Titus, Rostan, and Johnson; (3) compel the testimony of Plaintiffs Nightingale, Stonebarger, and Buehler; (4) introduce the 2004 Plan at Trial; and (5) clarify whether the Court has pre-judged its long list of proposed deductions from the gross sale price for Dresser-Rand.

## I. BACKGROUND

The facts of the case are long familiar to the parties and are discussed at length in this Court's prior Opinions. See, e.g., Doc. No. 355. As such, the relevant facts need be only briefly summarized.

In early 2000, Ingersoll Rand began to solicit buyers for Dresser-Rand, a recently acquired subsidiary. To further that purpose and to achieve a desirable sale price for Dresser-Rand, Ingersoll Rand adopted the Sales Incentive Plan ("2000 SIP") (Doc. No. 566-3). The 2000 SIP was meant "to reward key employees for their contributions toward maximizing [earnings] and consequently, a desirable sale price for Dresser-Rand Company." Id. It did so by providing Sale Value Units ("SVUs") to select employees that would trigger payments from Ingersoll Rand once Dresser-Rand was sold. The size of the payments increased linearly with the ultimate sale price, in accordance with a predetermined formula.

The 2000 SIP included a section setting forth how the value of an SVU would be calculated. That provision states, in its entirety:

> PERFORMANCE MEASUREMENT
>
> The value of the Dresser-Rand Sale Incentive Plan is based on one component; the net sale price of Dresser-Rand Company. The threshold net D-R sale price for the success pool payout curve to start payment above a base of $1.25 per SVU is a sale price of $500MM net of retained liabilities and sale expenses as determined

> by Ingersoll-Rand Controller's office. The payout curve starts with an SVU value of $1.25 that will be paid for any sales value. The payout is only for a successfully completed sale as determined by IR of Dresser-Rand Company.
>
> The success pool (payout curve) generated will be paid based on the <u>Net</u> proceeds from the sale of D-R as summarized below:
>
> - Gross Selling Price/Proceeds
> - Less all transaction fees; such as:
>   - Fees paid to investment bankers
>   - Amounts paid to bankers or others to finance the sale
>   - Other transaction fees
> - Less any liabilities associated with D-R that are assumed by Ingersoll-Rand Company
>
> Note: In the event IR accepts a note receivable or other equity as part of the sale it will have no consequence on the above calculation of net proceeds.

Awards under the 2000 SIP are calculated on the basis of a linear payout function which rewards sale prices above "$500MM net of retained liabilities and sale expenses." Payouts begin at $1.25 per SVU and increase to $13.58 at $600MM and $38.24 at $800MM. The 2000 SIP also provides that "[t]he sale of any major Dresser-Rand assets prior to the complete sale of the Company will be included in the overall net sale price. This overall net sale price will be used to determine the value of an SVU." Finally, the 2000 SIP contains a payment section which states, in part, that "[a]ny award under this plan will be paid no later than 90 days following the closing date of the sale of Dresser-Rand Company."

In spite of high hopes, efforts to sell Dresser-Rand initially failed. When the company could not be sold by the end of 2002, Ingersoll Rand temporarily abandoned its sale activities. Years passed without significant attempts to market the subsidiary to potential buyers. Then, in 2004, Ingersoll Rand received an unsolicited offer from a would-be acquirer, First Reserve. In light of this new offer, management restarted the sales process and instructed its agents to formulate a deal.

In spite of the intervening years, executives at Ingersoll Rand were cognizant of 2000 SIP and the payout schedule that it mandated upon sale. While management wanted Dresser-Rand employees to continue to work hard and boost Dresser-Rand's financial performance, it also wished to limit the amount of money that it would be required to pay in the event that a sale was consummated. In addition, Ingersoll Rand did not want the defection or retirement of critical employees to jeopardize the sale. In this vein, Ingersoll Rand devised a new incentive plan (the "2004 Plan"). Various materials were prepared for Ingersoll Rand executives which highlighted the thrift of the new arrangement relative to the 2000 SIP.

Ingersoll Rand announced the terms of the 2004 Plan in a letter distributed to Dresser-Rand employees at a July 16, 2004 meeting. Other similar letters were sent to a broader group of employees on August 26, 2004 (the "Henkel Letters"). In each letter, Ingersoll Rand claimed that the 2000 SIP was no longer in effect, writing that "the sale value units awarded for 2001, 2002 and 2003 have expired, as have all rights under that plan." The Henkel Letters promised cash, bonus opportunities, and in some cases stock options for employees who elected to enroll in the 2004 Plan. The letters required the recipients to sign and return the letters promptly or they would not be eligible for the benefits. However no portion of the letters suggested that the recipients were giving up any rights by enrolling. All of the Nye Plaintiffs signed and returned the Henkel letters. All of the Brown Plaintiffs except for Arthur Titus, William Rostan, and Gregg Johnson also signed the Henkel letters.[2]

On October 31, 2004, Ingersoll Rand sold Dresser-Rand to First Reserve for approximately $1.2 billion. After the sale was finalized, Ingersoll Rand paid Dresser-Rand

---

[2] Titus, Rostan, and Johnson left Dresser-Rand well in advance of the Henkel letters—Titus and Johnson in 2003 and Rostan in early 2004.

employees the benefits due under the 2004 Plan, totaling approximately $23.5 million. In addition, approximately $11 million in stock options vested early due to the sale.

In 2005 Ingersoll Rand entered into litigation with a number of employees who had left the company prior to the sale date (the "Antoun" and "Barnett" actions) (Ingersoll Rand Company v. Barnett, et.al., and Antoun, et. al. v. Ingersoll-Rand, Consol. Civ. No. 05-1636 (DRD)). The Antoun and Barnett plaintiffs claimed that the 2000 SIP had not terminated and that as retirees, they were entitled to pro-rated benefits under the plan. On October 26, 2006, this Court ruled that the 2000 SIP had not expired and that the Barnett and Antoun Plaintiffs were each "retirees" as contemplated under the agreement. Following the decision, on January 15, 2008, both cases were dismissed pursuant to a confidential settlement.

The consolidated action currently before the court asserts claims for breach of the same agreement that was at issue in Antoun and Barnett— the 2000 SIP. However, unlike the retirees in Antoun and Barnett, many of the Nye and Brown plaintiffs worked for Dresser-Rand until it was sold.[3] Ingersoll Rand contends that the 2000 SIP expired prior to the sale of Dresser-Rand and that in any event, the Plaintiffs surrendered any right to payment under the 2000 SIP by accepting payments under the 2004 Plan. On October 25, 2010 and May 10, 2011, the Court issued a set of Opinions and Orders granting summary judgment with respect to liability on behalf of each of the Bond, Nye and Brown plaintiffs except for Titus, Rostan, and Johnson.[4] The instant set of motions concern the upcoming damages trial.

---

[3] In contrast, the Bond Action involves individuals who worked for Dresser-Rand at the time that the 2000 SIP was promulgated but left the company prior to the sale.

[4] The October 25, 2010 Opinion held that the Bond plaintiffs were retirees as contemplated under the terms of the 2000 SIP. (Doc. No. 355). The May 10, 2011 Opinion held that the 2000 SIP had not expired, and that the Nye and Brown Plaintiffs were not estopped from collecting on it by virtue of their acceptance of the 2004 Plan. (Doc. No. 529). The status of Plaintiffs Titus,

## II.   DISCUSSION

Rule 702 governs the admissibility of expert testimony. It allows a qualified individual who possesses "scientific, technical, or other specialized knowledge" to testify as an expert if "it will assist the trier of fact to understand the evidence or to determine a fact in issue." FRE 702. A witness may be qualified by "knowledge, skill, experience, training, or education." Id. The expert may offer his or her opinion on matters outside the scope of his personal knowledge only if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FRE 702. Put another way, "Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008).

The "proponent of expert testimony must establish his expert is qualified and his testimony is admissible by a preponderance of the evidence." Poust v. Huntleigh Healthcare, 998 F.Supp. 478, 490 (D.N.J. 1998). The Court has an obligation to act as a "gatekeeper" to ensure the "reliability and relevancy of expert testimony" presented to the finder of fact. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); See also Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592–593 (1993).

To aid in this inquiry, Daubert and Downing cite several factors for the court to consider in examining the expert's methodology "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error;

---

Rostan, and Johnson and the appropriate measure of damages for all Plaintiffs were held to require the adjudication of disputed issues of material fact. Id.

(4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 742 (3d Cir. 1994) citing Daubert and United States v. Downing, 753 F.2d 1224 (3d Cir. 1985).

Applying this standard, the Court will first discuss the motions to exclude or limit the testimony of the various experts and then turn to the topical *in limine* motions.

**A.     Plaintiff Expert John Cherpock**

As a threshold matter, Mr. Cherpock, by virtue of his education, certifications, and experience, is clearly qualified to render expert opinions concerning the accounting treatment of business expenses. Mr. Cherpock is a Certified Public Accountant, a Certified Fraud Examiner, and is additionally certified in Financial Forensics by the American Institute of Certified Public Accountants. He has over thirty years of experience and a lengthy C.V.

Ingersoll Rand asks that the Court preclude Mr. Cherpock from testifying on several grounds. First, it argues that his "alternative method" of computing SVU value based on gross sales price has no bearing on the case. Second, it argues that his conclusions are based entirely upon Mr. Cherpock's limited direct experience with mergers and acquisitions. Third, it argues that Mr. Cherpock does not cite sufficient accounting authorities in his initial expert report. Last, it argues that Mr. Cherpock improperly opines on the state of mind of Ingersoll Rand and its executives. The Court will address each claim in turn.

First, the Court has already held that the 2000 SIP unambiguously embraces the "net sale price" as the benchmark of SVU value. (Doc. No. 603). Indeed, the contract uses the term "net"

no fewer than seven times. As such, the Court will preclude any suggestion—from Mr. Cherpock or anyone else— that the gross sale price be used in determining SVU value. The gross sale price may be used as a starting point to calculate the net sale price, nothing more.

Second, the contention that Mr. Cherpock's conclusions are exclusively drawn from his mergers and acquisitions experience is unpersuasive in light of his extensive accounting training and multiple expert reports. Mr. Cherpock will not be precluded from testifying on this basis. If Ingersoll Rand wishes to cross examine Mr. Cherpock with its artfully parsed snippet of deposition transcript, it may do so.

Third, the methodology articulated in Mr. Cherpock's expert reports is well reasoned and supported by his use of and citation to multiple reliable accounting treatises. The Court finds that it embraces the level of intellectual rigor common among experts in the field. Whether Mr. Cherpock reaches the appropriate conclusions is a matter for the jury to determine, and Ingersoll Rand may critique his assumptions and methods at trial. However neither is so obviously suspect or flimsy as to warrant preclusion as a matter of law.

Last, Mr. Cherpock takes some liberties when he speculates as to the intentions of Ingersoll Rand in structuring its transactions or characterizes certain determinations as made in "bad faith." The jury may come to the conclusion that Ingersoll Rand has acted in manifest bad faith in attempting to cheat its employees out of money promised under a valid contract. The jury may also conclude that Ingersoll Rand's attempt to deduct three hundred million dollars in sales expenses on a one billion dollar transaction is a continuation of these efforts. However this is not a matter where expert testimony will assist the fact-finder. Mr. Cherpock may not offer opinions as to the intentions or motivations of Ingersoll Rand or its employees.

**B.      Defense Expert John Dale Kitchens**

Like Mr. Cherpock, Mr. Kitchens is doubtlessly qualified by virtue of his education, certifications, and experience. Mr. Kitchens is a Certified Public Accountant with over thirty years of experience performing audits, quality reviews, investigations, and other assessments of financial statements. His experiences more than qualify him to offer the type of opinions contained within his expert report.

Plaintiffs ask the Court to exclude some of Mr. Kitchens's opinions for several reasons. First, they claim that his analysis of the Hanover Purchase Agreement is inappropriate, as the date of sale is a "legal question" about which the expert may not testify. Second, they challenge the methodology of Mr. Kitchen's analysis of the transaction. Third, they ask that his analysis of retiree medical liability be excluded due to its reliance upon the "2005 Estimated FAS 106 Expense" document. The Court will address each claim in turn.

First, while the closing date for the Hanover transaction may be determined through recourse to the transaction documents, it is not clear that this date governs its inclusion or exclusion from calculations under the 2000 SIP. The 2000 SIP uses the term "sale" rather than closing. The substance of Mr. Kitchens's opinion concerns the date in which the economic substance of the Hanover sale occurred and the date on which the sale occurred for reporting purposes. These matters may assist the jury in evaluating the otherwise ambiguous language in the 2000 SIP that may not be determined as a matter of law. Mr. Kitchens may testify on these matters.

Second, the methodology undergirding Mr. Kitchen's report is both well reasoned and well sourced. While Plaintiffs may cross examine Mr. Kitchens as to whether he has properly

11

interpreted SEC guidance, his reliance upon SAB 30 and SAB 99 is not so clearly improper as to warrant the exclusion of his testimony.

Third, the 2005 Estimated FAS 106 Expense document is clearly relevant to this case and will be permitted as evidence provided that it can be properly authenticated. Mr. Kitchen's reliance upon this document is proper and does not taint his conclusions.

**C.      Defense Expert Stuart Pachman**

Mr. Pachman is also highly qualified in his area of expertise, based on his significant experience in the field of business law. Mr. Pachman has practiced law for over forty years and has extensive experience in the field.

However the conclusions that Mr. Pachman draws in his expert report are fundamentally legal conclusions. Mr. Pachman tacitly acknowledges this failing, noting that he provides his certification "to assist the Court as to how the Transaction would be viewed from the perspective of a Business lawyer." (Pachman Rep. 2). Mr. Pachman's expert report, though well written, is essentially a legal brief, setting forth a legal interpretation of the contracts at issue based on his review of the documents in the case. While Mr. Pachman's opinions are not implausible or poorly-conceived, this form of expert testimony runs afoul of the Court of Appeal's prohibition on legal opinion in the guise of expert testimony.

Defendant attempts to salvage the opinion by characterizing it as a report on the "custom and practice" of business transactions. However Mr. Pachman's report is not merely an anthropological assessment of the culture of business lawyers. He draws specific conclusions concerning the intentions and legal significance of actions taken in this case. His opinion as to the legal significance of actions is inappropriate, and to the extent that the parties' intentions are unclear, direct testimony is better suited to reveal them. Mr. Pachman may not testify.

12

**D.     Defense Expert David Smalstig**

Mr. Smalstig is also a highly qualified individual. Mr. Smalstig is a Certified Public Accountant with over twenty-eight years of experience working at accounting and consulting firms to provide guidance on accounting, auditing, and other financial reporting practices related to complex business transactions. Mr. Smalstig is qualified to offer an opinion on the topics presented to him.

Plaintiffs ask the Court to exclude Mr. Smalstig's testimony for two reasons. First, they claim that Mr. Smalstig's opinions have insufficient "fit" with the facts of this case as they are predicated on assumptions that contradict the clear language of the SIP. Second they claim that his analysis of the impact of tax liability incurred by Ingersoll Rand in connection with the Dresser-Rand sale is irrelevant absent evidence establishing the taxes that Ingersoll Rand actually paid.

As a preliminary matter, Mr. Smalstig attaches undue importance to the portion of the second sentence of the "PERFORMANCE MEASUREMENT" section of the SIP. That provision states that "[t]he threshold net D-R sale price for the success pool payout curve to start payment above a base of $1.25 per SVU is a sale price of $500MM net of retained liabilities ***and sale expenses as determined by Ingersoll-Rand Controller's office***." (emphasis added). Mr. Smalstig (and Defendant) appear to read this provision as some delegation of authority to the Ingersoll Rand Controller to define what a "sales expense" is for the purposes of the SIP. Mr. Smalstig then devotes significant energy to arguing how a Controller—both in the abstract and the Ingersoll Rand's Controller specifically—would understand the term "sales expense."

This method of contract construction is improper, as it would: (1) void other portions of the contract which more carefully define which expenses are to be included in determining the

13

net sale price under the SIP; and (2) render the contract hopelessly indefinite. Clearly the Ingersoll Rand Controller cannot arbitrarily designate any expenditure as a sales expense. Properly read, the quoted language is not a grant of arbitrary authority—rather it provides that the Ingersoll Rand Controller shall be the party to *tabulate* the sales expenses. The Controller is not an interpretive authority; it is a calculator. This is in keeping with both the language of the contract and the traditional role of a Corporate Controller in tracking corporate expenses.

The SIP provides what expenses can be deducted from the Gross Selling Price/Proceeds to determine the "Net proceeds from the sale of D-R." Neither the Controller nor Mr. Smalstig can add to or subtract from listed expenses, although the practices in other contexts may assist the jury in determining whether a particular expense falls within the meaning of the language used in the SIP. Mr. Smalstig's testimony will be limited to that extent. It will be the function of the jury to determine the meaning of "Gross Selling Price/Proceeds," "transaction fees," "other transaction fees," and "sale of any major D-R asset."

### E.  Plaintiffs' *In Limine* Motions

#### 1.  Late Produced Documents

Plaintiffs object to the introduction of documents produced after the discovery deadline. The documents in question have been available to Plaintiffs for many months and Plaintiffs have made no showing of prejudice. The documents may be introduced, provided that they are otherwise admissible.

#### 2.  Amended Interrogatories

Plaintiffs object to the introduction of interrogatory answers that they have subsequently amended, claiming that they are "stale" and "superceded." Interrogatory answers are clearly admissible evidence, even if they have been subsequently modified or supplemented. To the

extent that the answers are otherwise relevant and proper, both sets of interrogatory answers may be admitted.

### 3.     SIP Expiration

Plaintiffs object to the introduction of any evidence to prove that the 2000 SIP "expired" prior to the sale of Dresser-Rand. The Court has ruled on this matter—at length—and found as a matter of law that the 2000 SIP did not expire. Defendant may not present evidence or argument suggesting that the 2000 SIP expired.

### 4.     Plaintiffs Evaluation of Legal Options

Plaintiffs object to the introduction of evidence concerning their consultation—with each other and legal counsel—concerning their legal options with respect to the 2000 SIP. Throughout this case, Defendant has pointed to these consultations as evidence of bad faith conduct and "double dipping" by Plaintiffs in an attempt to unreasonably collect on two mutually exclusive employee benefit arrangements.

Plaintiffs' consultations occurred years after the promulgation of the 2000 SIP. The meaning of the contract and the value of an SVU are facts independent of any subsequent actions by Plaintiffs. Evidence of Plaintiffs' consultations is irrelevant to the case at bar and may not be introduced.

### 5.     Extrinsic Evidence on 2000 SIP and Hanover Purchase Agreement

Plaintiffs object to the introduction of extrinsic evidence concerning the date of the Hanover sale. Plaintiffs argue that this date is conclusively determined by the contract. As stated above, neither the Hanover Purchase Agreement nor the 2000 SIP defines "sale" in a fashion that would enable this Court to rule on date of purchase as a matter of law. As such, both parties will be permitted to introduce evidence to resolve this ambiguity.

15

### 6. Video Depositions of Antoun and Gallagher

Plaintiffs wish to exclude the video depositions of Antoun and Gallagher from trial. Plaintiffs claim that Ingersoll Rand has made no showing that the witnesses are unavailable, that Plaintiffs were not provided with complete copies of the depositions and exhibits, and that Plaintiffs have had no opportunity to cross examine Messrs. Antoun and Gallagher.

Defendant represents that it has no ability to compel either witness to appear at trial, and the Court will take Defendant at its word. Contrary to Plaintiffs' contention, the depositions and exhibits have been fully produced by Defendant. While Plaintiffs did not have an opportunity to personally cross examine the witnesses at deposition, the witnesses in question were well represented by able counsel with a like interest in creating a useful trial record.

It is unclear from the briefing which sections Defendant intends to introduce. To the extent that the sections that Defendant seeks to introduce are otherwise admissible, they may be presented at trial.

### 7. Taxes, Capital Contributions, and Pre-Paid Insurance Write-Offs

Plaintiffs wish the Court to rule, as a matter of law, that the taxes, capital contributions, and pre-paid insurance write-offs claimed by Ingersoll Rand as deductions from the gross sale price of Dresser-Rand are inappropriate.

Defendants have introduced evidence that the sales taxes, capital contributions and insurance write-offs would be ordinarily understood by the parties to the SIP to be "sales expenses" or "transaction fees." While Plaintiffs may dispute these conclusions, the issue cannot be resolved as a matter of law and must be submitted to the jury. Both parties may introduce evidence to permit the jury to determine whether these expenses should be subtracted from the gross sale price in determining SVU value.

### 8. 2005 Estimated FAS 106 Expenses

Plaintiffs ask the Court to exclude a document titled "2005 Estimated FAS 106 Expenses," claiming that it was late-produced, hearsay, and cannot be properly authenticated. The document in question was produced over nine months ago. Plaintiffs have had ample time investigate this document and/or move for additional discovery. Their arguments concerning authenticity and relevance are similarly unpersuasive. As Plaintiffs have demonstrated no prejudice resulting from the late disclosure, Defendant may introduce the document.

### 9. Post-Sale Compensation

Plaintiffs finally request that evidence of the Dresser-Rand IPO or other post sale compensation of Plaintiffs be excluded as irrelevant and prejudicial. Plaintiffs note that Defendant is not arguing for an offset related to IPO related compensation.

The wealth or poverty of the parties is irrelevant to any issue in this case. Defendant would doubtlessly object if Plaintiffs sought to introduce evidence that it reported 14 billion dollars in net revenues last year. Defendant has offered no credible reason why the jury need be informed of the extent of Plaintiffs' earnings. Evidence of the IPO or any post-sale compensation will be precluded.

## F. Defendant's *In Limine* Motions

### 1. Inter-Company Cash Transfers

Defendant asks the Court to exclude evidence of Ingersoll Rand's cash management system. Ingersoll Rand's cash management policies led to regular inter-company transfers of cash between subsidiaries and the parent company. These transfers led to receivables documenting the substantial debt obligations between the parent and subsidiary. Receivables owed to Dresser-Rand from Ingersoll Rand were transferred to Ingersoll Rand and thereby

forgiven in connection with the sale to First Reserve. Plaintiff argues that these inter-company receivables constituted "major assets" under the SIP. Plaintiff further argues that evidence concerning the inter-company transfers is necessary for the jury to evaluate whether the inter-company receivables should be added to the gross sale price of Dresser-Rand for the purposes of determining the value of an SVU.

As stated above, the SIP does not clearly define "major asset." Given this ambiguity, the parties will be permitted to present evidence and argument that the inter-company receivables should or should not be considered for SVU calculation purposes.

### 2. Comparisons Between Bond Plaintiffs and Liability Plaintiffs

Defendant asks the Court to prohibit Plaintiffs from arguing that Plaintiffs Titus, Rostan, and Johnson are entitled to benefits under the SVU by virtue of their similarity to the Bond Plaintiffs. As the Court will separate the liability trial from the damages trial, it will defer ruling on this matter.

### 3. Testimony of Nightingale, Stonebarger, and Buehler

Defendant asks the Court to compel the testimony of Plaintiffs Nightingale, Stonebarger, and Buehler. Plaintiffs claim that the designated Plaintiffs are beyond the subpoena power of the Court and unavailable. Plaintiffs also argue that the witnesses' deposition testimony will suffice at trial.

Plaintiff's position is untenable. The designated plaintiffs are parties to this case and have voluntarily availed themselves of this Court's authority as a means to obtain relief against the Defendant. By filing a lawsuit in this district, Plaintiffs have voluntarily submitted to the jurisdiction of the Court and its inherent powers to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants" Cheyney State

18

College Faculty v. Hufstedler, 703 F.2d 732, 738 (3d Cir. 1983). If Plaintiffs did not want to come to New Jersey, they should not have filed a complaint here. The designated Plaintiffs will make themselves available for testimony.

### 4. 2004 Plan

Defendant seeks—yet again—permission to introduce the 2004 Plan at trial. The 2004 Plan was prepared years after the 2000 SIP and has absolutely no relevance to the construction of the prior agreement. Defendant seeks to introduce this contract in hopes of painting Plaintiffs as greedy "double-dippers" who have been already compensated enough. This is the very definition of prejudice. Defendant may not introduce evidence of the 2004 Plan.

### 5. Clarification of September 8, 2011 Ruling

Last, Defendant asks that the Court not prejudge the expenses that it will ask the jury to deduct from the gross sale price of Dresser-Rand. As previously discussed, both parties will be permitted to present evidence of the proper calculation of SVU price to the jury. The Court will not prejudge the evidence.

### III. CONCLUSION

The Court will enter an Order implementing this Opinion.

s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: November 9th, 2011